893 P.2d 4

David **WOLLENBERG** and Debra A. Wollenberg, husband and wife, Plaintiffs–Appellants,

v.

**PHOENIX LEASING INCORPORATED,** a California corporation, d/b/a Phoenix Leasing Cash Distribution Fund III; Phoenix American Alarm Affiliates, Inc., a Nevada corporation d/b/a Phoenix Leasing Cash Distribution Fund III; and Phoenix Leasing Cash Distribution Fund III, Defendants–Appellees.

No. 1 CA–CV 92–0267.

Court of Appeals of Arizona, Division 1, Department A.

Aug. 23, 1994.

Reconsideration Denied Oct. 14, 1994.

Review and Cross–Petition for Review Denied April 25, 1995.

McDaniel & Gan, P.C. by Chester J. Peterson, Phoenix, for plaintiffs-appellants.

Gammage & Burnham by Cameron C. Artigue, Phoenix, for defendants-appellees.

## OPINION

VOSS, Judge.

David Wollenberg and Debra A. Wollenberg (Wollenberg) appeal from an adverse judgment, and the denial of their motion for new trial, in their action against Phoenix Leasing Incorporated and related business entities (Phoenix Leasing) for a declaration that Wollenberg's security interest in the customer accounts of nonparty Sunrise Security and Sound, Inc., (Sunrise Security) took priority over a security interest that Sunrise Security later granted to Phoenix Leasing in the same collateral. We must decide whether the trial court correctly held that Phoenix Leasing's security interest took priority over that of Wollenberg. We have jurisdiction pursuant to Ariz.Rev.Stat.Ann. (A.R.S.) section 12–2101(B) and (F)(1).

## FACTS AND PROCEDURE BELOW

The action was tried to the court. Findings of fact and conclusions of law were made pursuant to Rule 52(a), Arizona Rules of Civil Procedure. No transcript has been included in the record on appeal. Both sides concede that the facts are not in dispute. We derive the pertinent facts from the trial court's findings as supplemented by documents admitted in evidence.

From the early 1980s through March of 1988, Wollenberg operated an alarm and security business under the name of "Paradise Valley Alarm Systems" as a sole proprietorship. In late 1987, non-party Warren D. Mays, having had previous experience with alarms and security, sought to re-enter the industry. Through Sunbelt Business Brokers, Mays learned of Wollenberg's Paradise Valley Alarm Systems.

Between December of 1987 and March of 1988, Wollenberg and Mays met about eight times to negotiate the sale/purchase of Paradise Valley Alarm Systems. Mays told Wollenberg that he had incorporated Sunrise Security and Sound, Inc., and intended to operate Paradise Valley Alarm Systems in that corporate form by transferring all its assets and operations into Sunrise Security.

In February and March of 1988, according to the purchase agreement which was prepared and signed, Mays agreed to buy Paradise Valley Alarm Systems for $255,000, $165,000 of which was to be represented by a promissory note secured by a chattel security agreement. The sale closed on March 31, 1988. At the closing Mays again expressed his intention to transfer Paradise Valley to Sunrise Security. Wollenberg stated that Mays was within his rights in doing so. Wollenberg executed a bill of sale conveying to Mays the business known as "Paradise Valley Alarm Systems," including, among other things, "customer accounts." Additionally, Wollenberg executed as secured party, and Mays executed as debtor, a chattel security agreement that granted Wollenberg a security interest in: "THAT CERTAIN BUSINESS KNOWN AS 'PARADISE VALLEY ALARM SYSTEMS' INCLUDING INVENTORY, CUSTOMER ACCOUNTS, THE BUSINESS TRADENAME AND TRADESTYLE, LEASEHOLD INTERESTS AND IMPROVEMENTS, AND THAT CERTAIN EQUIPMENT PER THE ATTACHED EXHIBIT 'A'...." The chattel security agreement form contained an optional after-ac-

quired property clause which was not made part of the agreement.[1]

In connection with the closing, Mays and Wollenberg also executed an "ARIZONA UNIFORM COMMERCIAL CODE FINANCING STATEMENT—Form UCC–1." This financing statement, dated March 31, 1988, identified the "Debtor(s)" as "Mays, Warren D. & Catherine E.," and gave notice that it covered: "THAT CERTAIN BUSINESS KNOWN AS 'PARADISE VALLEY ALARM SYSTEMS' INCLUDING INVENTORY, THE BUSINESS TRADENAME AND TRADESTYLE, LEASEHOLD INTERESTS AND IMPROVEMENTS, AND THAT CERTAIN EQUIPMENT PER THE ATTACHED EXHIBIT 'A' WHICH EXHIBIT IS INCORPORATED HEREIN BY REFERENCE. CUSTOMER ACCOUNTS."

On the day after the closing, April 1, 1988, Mays transferred all the assets and operations of Paradise Valley Alarm Systems to Sunrise Security and Sound, Inc. Four days later, on April 5, 1988, Wollenberg filed with the Arizona Secretary of State the UCC–1 Financing Statement identifying Mays as "debtor." Wollenberg never filed a new or amended financing statement naming Sunrise Security and Sound, Inc., as debtor.

Almost a year later, on March 9, 1989, Sunrise Security and appellee Phoenix Leasing executed a loan and security agreement by which Phoenix Leasing lent Sunrise Security approximately $150,000 and Sunrise Security granted Phoenix Leasing a security interest in "any and all Alarm Accounts of Borrower, now owned or hereafter acquired ... and any and all monitoring agreements between Borrower and any central monitoring stations...." Before entering into the security agreement with Sunrise Security, Phoenix Leasing conducted a lien search under the names of Sunrise Security and Sound, Inc. and Paradise Valley Alarm Systems, Inc. The search revealed no liens. On April 6, 1989, Mays executed on behalf of Sunrise Security a UCC–1 Financing Statement identifying the debtor as Sunrise Security and Sound, Inc. d/b/a Paradise Valley

Alarm Systems, Inc. The financing statement signed by Sunrise Security was filed with the Arizona Secretary of State on April 10, 1989.

Phoenix Leasing began collecting the ongoing accounts receivable of Sunrise Security in April of 1989. In August of 1989, Phoenix Leasing lent Sunrise Security additional funds in return for a new promissory note executed by Mays for Sunrise Security in the amount of $198,724.41, and a UCC–2 (continuation) Financing Statement in favor of Phoenix Leasing. The UCC–2 was filed with the Arizona Secretary of State on October 12, 1989.

Meanwhile, problems had arisen between Mays and Wollenberg. Mays allegedly defaulted on his promissory notes in favor of Wollenberg, leaving an unpaid balance in excess of $132,000 as of October 13, 1989. On discovering the lending relationship between Mays and Phoenix Leasing, Wollenberg demanded that they release Sunrise Security's financing statement. Both refused.

Wollenberg filed this action against Phoenix Leasing on February 2, 1990. The parties stipulated that further collections by Phoenix Leasing of payments on Paradise Valley Alarm Systems accounts, less a 10% administrative fee, would be deposited in a restricted bank account *pendente lite*.

The parties filed cross-motions for summary judgment. The trial court denied the motions. After trial, the trial court rendered its findings of fact and made the following pertinent conclusions of law:

1. Phoenix Leasing holds a perfected security interest in the accounts receivable of Sunrise Security.

2. Wollenberg's claimed security interest in the accounts receivable of Sunrise Security is unperfected, because Wollenberg breached his obligation of good faith under the Uniform Commercial Code by filing and relying upon a financing statement which he knew did not reflect the true state of affairs and which could be misleading to potential creditors.

. . . .

1. The printed form, as executed, contained a blank square followed by the words: "if checked here, all equipment of the same type or kind acquired by Debtor after date, and its proceeds."

4. Wollenberg's financing statement is not effective to perfect any security interest in the accounts of Sunrise Security because it is not filed in the name of the debtor, i.e., the owner of the collateral, as required by A.R.S. § 47–9402(A). Due to his acquiescence in Mays' transfer of Paradise Valley and express statement that Mays was "within his rights" in doing so, Wollenberg "authorized" this disposition of the collateral within the meaning of A.R.S. § 47–9306(B) and thus lacks a security interest in the collateral.

. . . .

6. Pursuant to A.R.S. § 47–9312, Phoenix Leasing's perfected security interest in the accounts receivable of Sunrise Security is superior to any interest of Wollenberg, assuming that Wollenberg holds a security interest in that collateral.

The trial court entered judgment in accordance with its ruling and later denied Wollenberg's motion for new trial. Wollenberg timely appealed.

## DISCUSSION

### A. Wollenberg's Contentions

Wollenberg bases his bid for reversal on three provisions of Arizona's version of the Uniform Commercial Code (UCC).[2] UCC section 9–201 provides in part:

Except as otherwise provided by this Act a security agreement is effective according to its terms between the parties, against purchasers of the collateral and against creditors.

UCC section 9–306(2) states:

Except where this Article otherwise provides, a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof unless the disposition was authorized by the secured party in the security agreement or otherwise, and also continues in any identifiable proceeds including collections received by the debtor.

UCC section 9–402(7) provides:

A financing statement sufficiently shows the name of the debtor if it gives the individual, partnership or corporate name of the debtor, whether or not it adds other trade names or the names of partners. Where the debtor so changes his name or in the case of an organization its name, identity or corporate structure that a filed financing statement becomes seriously misleading, the filing is not effective to perfect a security interest in collateral acquired by the debtor more than four months after the change, unless a new appropriate financing statement is filed before the expiration of that time. A filed financing statement remains effective with respect to collateral transferred by the debtor even though the secured party knows of or consents to the transfer.

Wollenberg argues that the court erred in concluding that he breached his obligation of good faith under UCC section 1–203[3] because at the time of the closing on March 31, 1988, the UCC–1 Financing Statement that the parties executed correctly identified Mays as "debtor." Wollenberg urges: "The undisputed evidence ... establishes that the financing statement was filed in the name of the debtor and that Mays were the owners of the collateral when the financing statement attached to the collateral." Wollenberg observes that as of the date of closing on March 31, 1988, Mays had rights in the collateral and had signed a security agreement containing a description of the collateral. Wollen-

---

2. Arizona substantially adopted the 1972 revised version of the Uniform Commercial Code in 1975 Ariz.Sess.Laws, Ch. 65, by amending and deleting portions of an earlier version of the UCC adopted in 1967 Ariz.Sess.Laws, Ch. 3, and enacting additional sections that appeared for the first time in the 1972 UCC. The legislature renumbered Arizona's version of the UCC to conform to the UCC numbering system. 1984 Ariz. Sess.Laws, Ch. 77. In general, the Arizona version substitutes "title" for "Act" and "chapter" for "Article" in the 1972 UCC. In this opinion we will refer to the applicable sections of the Arizona UCC according to their designation and numbering in the current version of the UCC, e.g., UCC section 9–201 (equivalent to A.R.S. section 47–9201). See Prairie State Bank v. IRS of Treasury Dept., 155 Ariz. 219, 745 P.2d 966 (App.1987).

3. UCC section 1–203 provides: "Every contract or duty within this Act imposes an obligation of good faith in its performance or enforcement." UCC section 1–201(19) defines "good faith" as "honesty in fact in the conduct or transaction concerned."

berg concludes that because he had given value, his security interest attached to the collateral as of that date pursuant to UCC section 9–203 [4].

Wollenberg further contends that his security interest continued in the collateral notwithstanding its transfer from Mays to Sunrise Security because Wollenberg did not authorize that transfer. Wollenberg argues his purchase money security interest in the collateral was perfected within the twenty-day period provided by UCC section 9–312(4),[5] and that it therefore took priority over that of Phoenix Leasing.

Finally, Wollenberg disputes the trial court's alternative conclusion that pursuant to UCC section 9–402(7), Wollenberg's financing statement was not effective to perfect a security interest in any accounts receivable that arose after four months following the transfer of Paradise Valley Alarm Systems to Sunrise Security. Wollenberg reasons that the Mays, who were correctly identified as the debtors in Wollenberg's financing statement when executed, never changed their names after the financing statement was filed. Wollenberg concludes the second sentence of UCC section 9–402(7) was therefore inapplicable. Wollenberg contends in addition that, based on the final sentence of UCC section 9–402(7), the financing statement he filed on April 5, 1988, remained effective with respect to all the collateral that Mays transferred to Sunrise Security and the proceeds thereof.

## B. Application of Law to Undisputed Facts

### I

■ We must first clarify which "customer accounts" the Wollenberg–Mays chattel security agreement covered as collateral. Under UCC section 9–106, an "account" is "any right to payment for goods sold or leased or for services rendered which is not evidenced by an instrument or chattel paper, whether or not it has been earned by performance." Thus, "customer accounts" comprehends not only accounts on which money is currently owed for services performed in the past, but also all accounts on which the account creditor would have a right to payment for services contractually due in the future. As stated in 8 WILLIAM D. HAWKLAND ET AL., UNIFORM COMMERCIAL CODE SERIES, § 9–106:02 (1990):

> The 1972 version defines an account to include rights to payment for goods sold or leased or services rendered whether or not they have been earned by performance. Thus, a secured party claiming accounts as collateral under the 1972 Code would have a security interest in the account as soon as the assignor of the contract right or account had rights in the collateral, that is, as soon as he or she signed the contract giving him or her an ultimate right to payment.

*Id.* at 331–32 (footnotes omitted). The security interest Mays granted to Wollenberg therefore extended to all Mays' active customer security accounts on the date the security agreement was executed, but no farther.

The UCC permits a security interest to extend to property acquired by the debtor after the creation of the security agreement only if the agreement itself provides that covered obligations are to be secured by after-acquired collateral. UCC § 9–204(1).

4. UCC section 9–203 provides in pertinent part:
 (1) [A] security interest is not enforceable against the debtor or third parties with respect to the collateral and does not attach unless:
 (a) the collateral is in the possession of the secured party pursuant to agreement, or the debtor has signed a security agreement which contains a description of the collateral...;
 (b) value has been given; and
 (c) the debtor has rights in the collateral.
 (2) A security interest attaches when it becomes enforceable against the debtor with respect to the collateral. Attachment occurs as soon as all of the events specified in subsection (1) of this section have taken place unless explicit agreement postpones the time of attaching.

5. UCC § 9–312(4) provides:
 A purchase money security interest in collateral other than inventory has priority over a conflicting security interest in the same collateral or its proceeds if the purchase money security interest is perfected at the time the debtor receives possession of the collateral or within ten days [twenty days in Arizona] thereafter.

See generally 2 JAMES J. WHITE AND ROBERT S. SUMMERS, UNIFORM COMMERCIAL CODE, § 24–6 (3d ed.1988) [hereinafter White & Summers]. Because the Wollenberg–Mays chattel security agreement did not cover after-acquired collateral, the security agreement granted by Mays to Wollenberg did not cover any new customer security accounts that arose after execution of the agreement.

## II

Having established the extent of Wollenberg's security interest, we now turn to the question of whether that interest continued after Mays transferred the accounts.

 Under UCC section 9–306(2), "a security interest continues in collateral ... and ... in any identifiable proceeds including collections received by the debtor." This remains true "unless the disposition was authorized by the secured party in the security agreement or otherwise...." *Id.* Thus, generally speaking, "when a debtor makes an unauthorized disposition of collateral, the security interest ... continues in the original collateral in the hands of the purchaser or other transferee...." *Id.*, Official Comment 3. The exception to this general rule occurs where the "disposition of the collateral by the debtor was authorized by the secured party free and clear of the secured party's security interest." *Id.* In such cases, the purchaser or other transferee acquires the collateral free and clear of the security interest and the secured party's only right will be to the proceeds received by the debtor in the sale or transfer. *Id. See In re Southern Properties, Inc.*, 44 B.R. 838 (Bankr.E.D.Va.1984).

In this case the trial court found that Wollenberg authorized Mays' transfer of the assets of Paradise Valley and Alarm Systems to Sunrise Security within the meaning of UCC section 9–306(2). The trial court concluded that Wollenberg thereby forfeited his security interest in the collateral pursuant to section 9–306(2). We cannot agree. There is no suggestion in the record or the trial court's findings that Wollenberg did anything other than acknowledge Mays' intent to transfer and state that Mays was within his

rights in doing so. There is no basis for any conclusion that Wollenberg authorized Mays to transfer the collateral free and clear of the security interest. For that reason, Mays' transfer of the collateral to Sunrise Security did not cut off Wollenberg's security interest under UCC section 9–306(2).

## III

Wollenberg does not challenge the trial court's conclusion that Phoenix Leasing holds a perfected security interest in the accounts receivable of Sunrise Security and Sound, Inc. This implied concession is certainly appropriate on the record before us. UCC section 9–203(1) provides that a security interest is perfected when it has attached and when all of the applicable steps required for perfection have been taken. Under section 9–203(1) and (2), a security interest attaches to collateral when the collateral is in the possession of the secured party pursuant to agreement or the debtor has signed a security agreement containing a description of the collateral, value has been given, and the debtor has rights in the collateral.[6] The remaining essential step for perfecting a security interest in accounts receivable is the filing of a financing statement. UCC § 9–302(1).

In this case, Sunrise Security signed a security agreement containing a description of collateral including customer accounts, Phoenix Leasing gave value for the security interest in the form of loans, and Sunrise Security had rights in its own customer accounts to begin with. Phoenix Leasing perfected its security interest by filing a financing statement that provided all the information required by UCC section 9–402(1).

## IV

Wollenberg's competing security interest was a purchase money security interest in accounts receivable. UCC section 9–312(4) provides:

A purchase money security interest in collateral other than inventory has priority over a conflicting security interest in the

6. *See* footnote 4, *supra.*

same collateral or its proceeds if the purchase money security interest is perfected at the time the debtor receives possession of the collateral or within ten days [twenty days in Arizona] thereafter.

Accordingly, if Wollenberg perfected his security interest by the twentieth day following April 1, 1988, when Mays transferred the assets of Paradise Valley Alarm Systems to Sunrise Security, he would necessarily prevail over Phoenix Leasing. On the other hand, if Wollenberg's financing statement was invalid or if he otherwise failed to perfect his security interest, Phoenix Leasing would prevail. *See* UCC § 9–312(5)(a) (priority dates from first filing or first perfection, whichever is earlier); UCC § 9–301(1)(a) (unperfected security interest is subordinate to rights of persons entitled to priority under section 9–312).

■ Like Phoenix Leasing, Wollenberg was required to file a proper financing statement to perfect his security interest. The sufficiency of a financing statement is measured by UCC section 9–402, which provides in part:

(1) A financing statement is sufficient if it gives the names of the debtor and the secured party, is signed by the debtor, gives an address of the secured party from which information concerning the security interest may be obtained, gives a mailing address of the debtor and contains a statement indicating the types, or describing the items, of collateral. . . .

. . . .

(7) A financing statement sufficiently shows the name of the debtor if it gives the individual, partnership or corporate name of the debtor, whether or not it adds other trade names or the names of partners. Where the debtor so changes his name or in the case of an organization its name, identity or corporate structure that a filed financing statement becomes seriously misleading, the filing is not effective to perfect a security interest in collateral acquired by the debtor more than four months after the change, unless a new appropriate financing statement is filed before the expiration of that time. A filed financing statement remains effective with respect to

collateral transferred by the debtor even though the secured party knows of or consents to the transfer.

(8) A financing statement substantially complying with the requirements of this section is effective even though it contains minor errors which are not seriously misleading.

Wollenberg takes the position that his financing statement, which names Mays as the debtor, was correct at the time it was executed and therefore gave the name of the "debtor" as required by this section. The trial court disagreed with Wollenberg and held that filing a financing statement which listed Mays as debtor was insufficient to perfect Wollenberg's security interest. We cannot agree with the trial court's reasoning on this point. Section 9–402 only requires that a financing statement be signed by the debtor and include the names and addresses of the debtor and secured party and a description of the collateral. U.C.C. § 9–402. Wollenberg's financing statement complied with all of these requirements. Therefore, absent some supervening consideration, as long as Wollenberg filed within the required twenty-day period his security interest would have "remain[ed] effective with respect to the collateral transferred by [Mays] even though [Wollenberg knew] of or consent[ed] to the transfer." *Id.*

■ Here, the trial court found that a supervening consideration did exist: namely, the duty under U.C.C. section 1–203 to act in good faith. The trial court found that Wollenberg lacked the requisite good faith in filing a financing statement and listing Mays as the debtor. We will not substitute our own opinion with regard to this issue unless the trial court's finding is unsupported by the evidence. *DeForest v. DeForest*, 143 Ariz. 627, 694 P.2d 1241 (App.1985). From the record it is clear that Wollenberg, while he may not have consented to the transfer of the collateral, surely understood that such a transfer would take place almost immediately after the sale. Knowing this, Wollenberg had to realize that the financing statement he was filing—while technically correct—contained an imminently misleading debtor designation. Given these facts, we cannot say

the trial court was clearly erroneous in its findings. *See generally In re Kalamazoo Steel Process, Inc.*, 503 F.2d 1218, 1222 (6th Cir.1974)("[A] secured party cannot claim that it is being completely honest when it files a financing statement knowing that it will be indexed under a name that will be in use only so long as it takes two corporations to take the legal steps required to change their names. This makes a farce out of notice filing." (footnote and internal quotation marks omitted)). *Woods, Div. of Hesston Corp. v. Bath Industrial Sales, Inc.*, 549 A.2d 1129 (Me.1988)(where secured party knows at execution of security agreement that debtor anticipates changing its name, but fails to insure that the financing statement indicates the imminent name change, the secured party fails to act in good faith as required by UCC section 1–203, and the financing statement fails to perfect the security interest).

Therefore we affirm the trial court on the ground that Wollenberg failed to act in good faith in filing a financing statement listing Mays as the sole debtor.

### C. Attorney's Fees

█ Phoenix Leasing requests an award of attorney's fees on appeal pursuant to A.R.S. section 12–341.01. An award of attorney's fees is permissible under A.R.S. section 12–341.01(A) in a contest between competing security interests in the same collateral. *Arizona Farmers Prod. Credit Ass'n v. Northside Hay Mill & Trading Co.*, 153 Ariz. 333, 736 P.2d 816 (App.1987); *Arizona Ammonia of Tucson, Inc. v. Mission Bank*, 152 Ariz. 361, 732 P.2d 591 (App.1986). We grant the request. Phoenix Leasing may establish the amount of its award by complying with Rule 21(c), Arizona Rules of Civil Appellate Procedure.

Affirmed.

GRANT, P.J., and EHRLICH, J., concur.