## In re SHENANDOAH WAREHOUSE COMPANY, Debtor.

Robert W. CLAYTOR, Robert W. Claytor, Trustee, George Caley, Kathryn Claytor, Clarence E. Leber, Afton R. Malick, Douglas R. Malick, Nelson O. Mills, Joe Sackett, Estate of Lamar Sloan, and Beverly L. Snyder, Movants,

v.

## SHENANDOAH WAREHOUSE COMPANY, Respondent.

Bankruptcy No. 5-96-00346.

United States Bankruptcy Court, W.D. Virginia, Harrisonburg Division.

Aug. 20, 1996.

Nate L. Adams, III, Winchester, VA, for movants.

Mark B. Callahan, Harrisonburg, VA, for unsecured creditors' committee.

David W. Earman, Harrisonburg, VA, for debtor.

## DECISION AND ORDER

ROSS W. KRUMM, Chief Judge.

Before the court is the motion for relief from the automatic stay of Robert W. Claytor, *et. al.* (herein the Movants) and the objection of the unsecured creditors' committee (herein the Committee). The issue presented is whether a security agreement dated December 31, 1993, (herein the Security Agreement) entered into by the Movants and the debtor, Shenandoah Warehouse Company (herein Shenandoah), grants the movants a security interest only in the accounts receivable held by Shenandoah at the time that the agreement was executed or in those receivables plus any that Shenandoah acquired thereafter (*i.e.* after-acquired receivables).

The briefs on this issue were filed prior to oral argument, which the court heard on June 7, 1996.[1] The court has considered the

---

1. Shenandoah filed a brief that supports the objection of the creditors' committee. The parties also have filed briefs on the issue of whether the

movants may introduce parol evidence in order to aid the court in determining the scope of the security interest granted in the security agree-

briefs and the oral arguments of counsel. For the reasons set forth in this decision and order, the court holds that the Security Agreement grants the Movants an interest in Shenandoah's after-acquired receivables as well as those that it held at the time the Security Agreement was executed.

## Facts

The parties have stipulated the following facts:

1) Shenandoah is a Virginia Corporation with its principal place of business in Winchester, Virginia;

2) Prior to filing its petition, Shenandoah's business was the wholesale and retail distribution and sale of auto parts from inventory;

3) The Movants formerly owned shares in Shenandoah;

4) Thomas C. Gibbs, Jr. purchased the Movant's shares in the debtor on December 31, 1993, and on the same date Shenandoah executed notes payable to the Movants on which $428,772.66 in principal was owing as of the date of the filing of Shenandoah's petition. The notes were secured with the Security Agreement;

5) The Security Agreement granted the Movants a security interest in *"the inventory, accounts receivable, fixtures and all other tangible personal property of the Debtor."* (emphasis added) Shenandoah warranted in the Security Agreement that it would maintain the inventory at or above its current level, provide the existing board of directors with quarterly reports so long as any money was owed on the notes, and do whatever was necessary to perfect and continue the Movant's interest in its collateral;

6) Shenandoah executed a financing statement which listed the Movants as secured parties and which was filed in Winchester and with the State Corporation Commission;

7) The financing statement lists the Movant's collateral as "[a]ll inventory, accounts receivable, fixtures, and all other tangible personal property of the debtor;"

8) On March 22, 1996, Shenandoah filed a Chapter 11 petition, which was an act of default under the Security Agreement.

## Positions of the Parties

Shenandoah argues that the Security Agreement does not contain language which specifically grants an interest in after-acquired property and, hence, manifests an intent not to grant an interest in after-acquired receivables. Further, Shenandoah argues that Code of Virginia § 8.9–204(1) implies that specific language is required in order to grant a security interest in after-acquired property.[2]

The Committee makes the same arguments as Shenandoah. In addition, the Committee contends that "it is inconceivable that the attorneys responsible for drafting Movants' Security Agreement could have intended to include after-acquired property as collateral and yet overlooked the issue … [by not including specific language relating to after-acquired property] when preparing the document."

The Movants claim that the court should read the phrase "accounts receivable" in the Security Agreement to include after-acquired receivables. For support, they point to Code of Virginia § 8.9–110, which sets forth a "reasonable identification" rule.[3] They also note that the "majority rule" reflected in the case law is that a security interest in after-acquired accounts receivable and/or inventory need not be evidenced by a specific after-acquired property clause in either the security agreement or the financing statement. Finally, the Movants point out that the Security Agreement provides that Shenandoah must maintain minimum levels of inventory and take action to continue their lien, which, they claim, reveals the fact that they were

---

ment. However, the court has determined that the movants should prevail regardless of their parol evidence, and, therefore, it will not render a decision on the parol evidence issue.

**2.** Section 8.9–204(1) states that "a security agreement may provide that any or all obli-

gations covered by the security agreement are to be secured by after-acquired collateral".

**3.** Section 8.9–110 states that "[f]or purposes of this title any description of personal property or real estate is sufficient whether or not it is specific if it reasonably identifies what is described."

given an interest in after-acquired receivables.

## Discussion

█ Whether a security agreement creates a lien on certain assets is a question to be answered by reference to state law. *See Butner v. United States,* 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1978). However, neither the courts of Virginia nor any federal court interpreting Virginia law have decided whether a security agreement which grants an interest in "accounts receivable" creates an interest in after-acquired receivables. Therefore, this court must examine decisions in other jurisdictions which have decided a similar issue.[4]

*In re Middle Atlantic Stud Welding Co.,* 503 F.2d 1133 (3rd Cir.1974), (herein Middle Atlantic) is discussed in all of the briefs. The security agreement in *Middle Atlantic* granted the creditor a security interest in "all Receivables and proceeds thereof...." and defined receivables as "all of Debtor's Accounts Receivable." *Id.* at 1134. The bankruptcy and district court held that the absence of specific language granting the creditor an interest in after-acquired receivables defeated his claim to those receivables. *Id.* at 1135.

On appeal, the Third Circuit majority began its reasoning by acknowledging that the Uniform Commercial Code (U.C.C.) does not require that security agreements meet exacting standards in terms of detail. It noted that the comment to U.C.C. § 9–110[5] "advises courts not to require the most exact and detailed description possible, but to be satisfied with a description that enables identification of the intended collateral." *Id.*

The court also acknowledged that "current commercial practice makes wide use of floating lien financing on inventory and accounts receivable," and that "[b]ecause the identity of ... [the receivables] is in flux, the lien may be intended to float from today's receivables to tomorrow's." *Id.* at 1135–1136.

Hence, the court conceded that "[t]here is ... a rational basis for appellant's premise that many persons, on reading that the collateral for the security agreement at bar is 'all accounts receivable', would be alerted that the parties may well have intended to include after-acquired accounts." *Id.* at 1136.

Nevertheless, the court decided to uphold the district court's decision, reasoning as follows:

[I]t is neither onerous nor unreasonable to require a security agreement to make clear its intended collateral. This position does not require the most exact and detailed description possible, but only a clear designation of any class of items intended to be collateral. The general prohibition in pre-Code law on including after-acquired property as collateral heightens the sense of such a rule because, commercial practice of including after-acquired property in collateral notwithstanding, a subsequent lender might expect the parties to make explicit an intention to include this kind of property, both for precision and because of the law's historic hostility to such arrangements.

Further, a decision for appellant might well facilitate at least some abuse. Although it may be true that many, perhaps most, prospective lenders, on reading the present agreement, would obtain an unambiguous explanation of its full meaning from the secured party, some might be misled and proceed without inquiry. The ease with which a secured party could eliminate the danger of misleading any reasonable subsequent lender suggests that in administering the Code the courts should require him to do so. *Id.*

Chief Judge Seitz dissented in *Middle Atlantic.* Like the majority, he recognized the necessity of using "floating liens" when accounts receivable and/or inventory are collateral because "the nature of specific inventory items or accounts is likely to vary daily, although the total of a business' inventory or

---

**4.** Decisions in other circuits have addressed issues similar to the one raised in the case at bar. However, all of these decisions involved security agreements where the word "all" preceded ac-

counts receivable. In this case the word "all" is missing from the security agreement.

**5.** *See supra* note 3 for the text of section 9–110.

874

accounts remain reasonably stable for long periods." *Id.* at 1137. He then stated that [i]t would ... be commercially reasonable to anticipate, unless the financing statement indicated otherwise, that security interests in inventory or accounts would include after-acquired property, even though the presumption would be reversed for other property. *Id.*

Chief Judge Seitz then stated:

In line with the mandate of the UCC that it be given a commercially reasonable interpretation I would not read the Code as requiring an explicit statement to perfect an interest in after-acquired inventory or accounts, even though the requirement may not seem onerous to this Court—the Code enjoins courts to interpret its provisions in a commercially reasonable manner rather than to require businessmen to follow judicial decisions and comply with them so long as they are not onerous. We deal in commercial litigation with matters of contract; few requirements will be onerous in themselves, but we cannot reasonably expect businessmen to fulfill the onerous task of familiarizing themselves with all the pertinent case law before taking any action in the conduct of their businesses. *Id.*

Finally, Chief Judge Seitz does away with the majority's justification for its specific description ruling (pre-Code hostility to the use of after-acquired property as collateral) by stating that pre-Code hostility is not relevant because the Code "authorizes security interests in after-acquired property" and by noting that the definition of receivables in the security agreement and financing statement means "*all* of Debtor's Accounts Receivable...." *Id.* (emphasis added) He concludes his dismissal of the majority's rationale by stating:

[u]nder the UCC this language adequately notifies interested parties that the secured party had an interest in literally all debtor's accounts receivable, including after-acquired accounts. *Id.*

Chief Judge Seitz's dissent in *Middle Atlantic* has been adopted by a majority of courts which have issued decisions where language in the security agreement covered

"all" inventory or accounts receivable but contained no specific reference to after-acquired property. *See, e.g., American Employers Ins. Co. v. American Sec. Bank,* 747 F.2d 1493, 1501 (D.C.Cir.1984) ("It is reasonable to read a security agreement granting an interest in all inventory or receivables to include after-acquired inventory or receivables." (citing, among other cases, Chief Judge Seitz's dissent in *Middle Atlantic* )); *In re Sims Office Supply Inc.,* 83 B.R. 69, 73 (Bankr.M.D.Fla.1988) (involving a security agreement that gave the creditor an interest in "all inventory...."; the court concluded that "[i]n furtherance of prevailing and accepted commercial lending practices, the Court finds that a provision for after-acquired property is to be automatically presumed unless there is some indication that the parties intended a different result."); *In re Fibre Glass Boat Corporation,* 324 F.Supp. 1054, 1056 (S.D.Fla.1971), aff'd, 448 F.2d 781 (5th Cir.1971) ("[s]urely the creditor would not enter into a financing arrangement secured by collateral fixed on a particular date, when the collateral by its nature would be constantly changing. It would be straining the normal meaning of the word to find that inventory meant only that on hand on the particular day the contract was executed....").

Some courts have followed the majority opinion in *Middle Atlantic. See, e.g., In Re Balcain Equipment Co., Inc.,* 80 B.R. 461, 462 (Bankr.C.D.Ill.1987), citing *Middle Atlantic,* stated that "[t]his court is of the opinion the Uniform Commercial Code contemplates the security agreement should clearly spell out any claims to after acquired collateral."; *Wollenberg v. Phoenix Leasing Inc.,* 182 Ariz. 4, 8, 893 P.2d 4, 8 (Ct.App. 1994) ("[t]he UCC permits a security interest to extend to property acquired by the debtor after the creation of the security agreement only if the agreement itself provides that covered obligations are to be secured by after-acquired collateral.").

Other courts have refused to follow the reasoning of Chief Judge Seitz due to facts of the particular case. For instance, in *In re Nightway Trans. Co., Inc.,* 96 B.R. 854, 859 (Bankr.N.D.Ill.1989), a case in which the

debtor had executed a security agreement giving the creditor a security interest in "all accounts receivable from any source whatsoever," the court refused to find a security interest in after-acquired receivables because the creditor had not presented evidence that the debtor was engaged in the type of business where receivables were changing constantly. *See also Balcain Equipment,* 80 B.R. at 462 (the court supported its decision to deny the creditor an interest in after-acquired inventory by noting that "[t]he security agreement specifically provides after acquired accounts receivable are covered. Similar language is not used to describe the security interest in inventory.").

Because the decided cases involve security agreements using the word "all" before the collateral in question, the case at bar is somewhat unique. However, in *Middle Atlantic* the use of the word "all" in the definition of receivables was significant to Chief Judge Seitz only in the context of explaining away the flaw in the majority's rationale for its holding *i.e.* pre-Code hostility to after-acquired property clauses. Chief Judge Seitz saw the floating lien on accounts receivable as an established business practice and believed that businessmen would expect, in the normal course of commerce, that a reference to accounts receivable in a security agreement was intended to cover "all" receivables, including those generated by the debtor throughout the life of the security agreement. *Id.* at 1137. Chief Judge Seitz believed that the better rationale for decision was *customary and expected commercial practice.* Thus, use of the word "all" in the security agreement in order to find a security interest in after-acquired property was not necessary.

This court agrees with the point of view expressed by Chief Judge Seitz in *Middle Atlantic.* Due to the revolving nature of receivables in most businesses, it would rarely, if ever, benefit a creditor to take a security interest in only the accounts receivable held by a debtor on the date of a security agreement since those receivables likely would be liquidated in the normal course of the debtor's business and be replaced with new receivables throughout the business cycle. The commercially reasonable interpretation of the phrase "accounts receivable" in a security agreement is that it includes all receivables existing as of the date of the security agreement and after-acquired receivables generated during the life of the security agreement.

The Committee and Shenandoah argue that the implication of Code of Virginia § 8.9-204(1), is that if after-acquired property is to be covered by a security agreement, the agreement must so "provide" through express language.[6] However, the comment to section 8.9-204 does not reveal that the drafters were concerned that express language be used to create an after-acquired property interest. Rather, the comment shows that section 8.9-204(1) was created simply to clarify that after-acquired interests are valid under the U.C.C.[7] Therefore, the implication of § 8.9-204 advocated by the Committee and Shenandoah is not dispositive, especially in light of section 8.9-110, which requires only a reasonable collateral description.

The court notes that there is no evidence that suggests that Shenandoah did not intend to grant an after-acquired interest in its receivables to the Movants. For example, unlike the *Balcain Equipment* case, the Security Agreement here does not expressly grant

---

**6.** *See supra* note 2 for the text of section 8.9-204(1).

**7.** For example, paragraph 2 of the comment explains that "[t]his Article accepts the principle of a 'continuing general lien.' It rejects the doctrine—of which the judicial attitude toward after-acquired property interests was one expression—that there is a reason to invalidate as a matter of law what has been variously called the floating charge, the free-handed mortgage and the lien on shifting stock. This Article validates a security interest in the debtor's existing and future assets, even though ... the debtor has liberty to use or dispose of collateral without being required to account for proceeds or substitute new collateral." Paragraph 2 goes on to explain the premise behind the courts' historical hostility toward floating liens and the reason it was rejected by the drafters of the U.C.C.

Nowhere in the comment does it state that after-acquired interests must be created through express language.

an after-acquired interest in inventory while omitting reference to after-acquired property with respect to receivables. Moreover, unlike the *Nightway* case no one has questioned the fact that Shenandoah's receivables were constantly changing.

### Conclusion

For the foregoing reasons, this court holds that use of the words "accounts receivable" in the Security Agreement dated December 31, 1993, includes accounts receivable existing as of that date and all accounts receivable of the debtor generated during the term of the Security Agreement. Accordingly, it is

ORDERED:

That the unsecured creditor's committee's objection to the motion for relief of Robert W. Claytor, et. al. be, and it hereby is, DENIED. All proceeds of receivables in excess of the lien of F & M Bank—Winchester shall remain in escrow pursuant to this court's order of May 22, 1996. A status hearing as to disposition of the proceeds of receivables in excess of the F & M Bank—Winchester lien shall be held on *September 5, 1996, at 11:00 a.m. in the Courtroom, Third Floor, U.S. Court House, Harrisonburg, Virginia.*