976 F.2d 1012
 20 UCC Rep.Serv.2d 645
 CHRYSLER CREDIT CORPORATION, a Delaware corporation,
Plaintiff-Appellant,
v.
KNEBEL CHEVROLET-BUICK, INCORPORATED, doing business as
Knebel Motor Sales, Incorporated, Mathew R.
Swanson, Marilyn I. Swanson, et al., Defendants,
and
First National Bank of Monterey, Intervening Defendant-Appellee.
 No. 91-2000.
 United States Court of Appeals,
Seventh Circuit.
 Argued Feb. 14, 1992.
Decided Aug. 4, 1992.
As Modified on Grant of Rehearing
in Part; Rehearing Denied in Part
Oct. 22, 1992.
 
 Maurice J. McCarthy (argued), Abramson & Fox, Chicago, Ill., Thomas J. Brunner, Jr., Paul J. Peralta, Baker & Daniels, South Bend, Ind., Steven L. Jackson, Baker & Daniels, Fort Wayne, Ind., for plaintiff-appellant.
 Daniel P. Murphy, Winamac, Ind., Charles W. Weaver, David Wallsmith, Knox, Ind., for defendants.
 Steven A. Johnson (argued), Spangler, Johnson & Associates, Merrillville, Ind., for intervening defendant-appellee.
 Before CUDAHY, COFFEY and MANION, Circuit Judges.
 CUDAHY, Circuit Judge.
 
 
 1
 In this diversity case the district court resolved a variety of claims involving the financing of a now-defunct car dealership. Chrysler Credit Corporation originally sued Knebel Chevrolet-Buick, Inc., d/b/a Knebel Motor Sales, Inc. (the dealership), for replevin, damages and injunctive relief, and additional parties were subsequently joined. After appointing a receiver and holding a bench trial, the district court ruled on all claims and entered final judgment. In this appeal, Chrysler Credit raises three specific challenges to the district court's resolution of claims involving defendant First National Bank of Monterey (the Bank). The parties agree that Indiana law governs the dispute.
 
 
 2
 Chrysler Credit's first argument involves eighteen used cars that were removed from the dealership premises by the Bank and sold in late 1989, during the course of the litigation. The proceeds from the sale, $121,040, were placed in escrow. Both the Bank and Chrysler Credit claim to have security interests in the eighteen used cars. The district court found the Bank's interest superior to that of Chrysler Credit and awarded the proceeds to the Bank. Chrysler Credit contends that it is entitled to the proceeds because it had the only perfected security interest in the used cars.
 
 
 3
 Chrysler Credit does not contest the Bank's underlying security interest in the eighteen used cars. Chrysler Credit's asserted security interest requires closer scrutiny. The series of security agreements in effect between Chrysler Credit and the dealership (at least until April 1989) did not cover all of the dealership's inventory, as Chrysler Credit claims. The description of collateral covers "each and every Vehicle financed hereunder ... and all proceeds thereof." Chrysler Credit financed new cars (as well as some used cars purchased at auction sales). The eighteen cars at issue here were trade-ins; they were not "vehicles financed hereunder" and thus not within the security agreement's primary description of collateral. To the extent that there is any ambiguity in this regard, the trial judge resolved it by finding that these used cars were not considered by Chrysler Credit to be within its set of financed vehicles.
 
 
 4
 If the used cars were trade-ins, however, perhaps a security interest attached by virtue of their being "proceeds" of the sale of new cars (which were financed by Chrysler Credit). Under § 26-1-9-306 of the Indiana Code, a security interest extends to identifiable proceeds of the sale of collateral. The parties' security agreement here specifically provides that the term "proceeds" includes "money ... [and] goods received in trade including without limitation vehicles received in trade...." The Bank argues, however, that Chrysler Credit received its full proceeds, in the form of money, on the sale of the new cars that had been purchased with the help of the eighteen trade-ins. When the dealership accepted a used car as a trade-in in partial payment for a new car, the Bank financed the used car by making payment to the dealership (pursuant to the Bank's security agreement with the dealership). The dealership then paid Chrysler Credit the full amount due on the new car. The trial judge found that this was the arrangement with respect to the eighteen used cars, and Chrysler Credit does not challenge that finding. We agree with the district judge and with the Bank that these payments extinguished Chrysler Credit's security interest in the used cars. The security agreement provides that Chrysler Credit's security interest "shall attach to the full extent provided or permitted by law to the proceeds, in whatever form, of any disposition of said Collateral or to any part thereof by Debtor until such proceeds are remitted and accounted for as provided herein" (emphasis added). Since proceeds can take the form of money or vehicles, the full payment to Chrysler Credit on its financed cars extinguished its security interest in the trade-ins as proceeds from the sale of the new cars.
 
 
 5
 But a new security agreement (the "Security Agreement and Capital Loan Agreement") was entered between Chrysler Credit and the dealership on April 14, 1989, shortly before this suit began.[1] This new agreement provides Chrysler Credit with a true inventory lien. As collateral it describes, inter alia, "all of Borrower's Inventory, including but not limited to all new and used motor vehicles." This agreement secured the collateral for "all Obligations due [Chrysler Credit]." While the earlier agreements did not provide Chrysler Credit with a valid security interest in the eighteen used cars, the April 14, 1989 agreement surely did.
 
 
 6
 Since both the Bank and Chrysler Credit had security interests in the eighteen used cars, we must decide which party had the superior interest. Through 1989, Chrysler Credit had a valid U.C.C. financing statement on file with the Indiana Secretary of State. That statement, number 491032, covered "[n]ew and used Motor Vehicles and Chattel Paper, whether now owned or hereafter acquired." Chrysler Credit had a perfected security interest as of April 14, 1989, when its inventory lien came into force. Ind.Code § 26-1-9-402.
 
 
 7
 Was the Bank's security interest perfected as to the eighteen used cars? The Bank also had a financing statement on file, but its financing statement contained a description of collateral as follows:
 
 Used Car Inventory
 
 8
 See Attachment "A"
 
 
 9
 Attachment "A" consisted of several specific used cars, none of which is at issue here. Chrysler Credit argues strenuously that the Bank's security interest was not perfected as to the eighteen cars at issue here because the financing statement failed to include a reference to "after-acquired" inventory. Chrysler Credit relies on language in In re Vitreous Steel Prods. Co., 911 F.2d 1223, 1226 (7th Cir.1990), that supposedly requires such an "after-acquired" clause in order to achieve perfection as to after-acquired inventory. In fact, Chrysler Credit is quoting from the statement of facts in Vitreous Steel. The case does not hold such a proposition; it appears simply to assume it. Most authorities state that a financing statement need not contain a specific reference to after-acquired inventory in order to serve as adequate protection as to such inventory. See, e.g., 8 Ronald A. Anderson, Uniform Commercial Code § 9-110:20, at 613-14 (1985); Barkley Clark, The Law of Secured Transactions Under the Uniform Commercial Code p 2.02[a], at 2-23 (1988); 9 William D. Hawkland, Uniform Commercial Code Series § 9-402:13, at 551 (1991) (all citing cases); U.C.C. § 9-402, comment 2 ("the financing statement is valid to cover after-acquired property and future advances under security agreements whether or not mentioned in the financing statement"). Although we are unaware of any Indiana case directly on point, the Indiana Court of Appeals has noted that "the collateral description requirement for financing statements is somewhat less demanding than the requirement for security agreements." Citizens Nat'l Bank v. Wedel, 489 N.E.2d 1203, 1208 (Ind.App.1986). This is because the function of a financing statement is "only to provide enough notice so that other creditors will make further inquiry to determine the nature and extent of security interests in the debtor's collateral." Id. Given these authorities, we doubt that the Bank's omission of an after-acquired clause in its financing statement, by itself, is fatal to its claim of perfection as to the eighteen used cars.
 
 
 10
 However, there is a related problem with the Bank's financing statement. While it describes the collateral as "Used Car Inventory," it also includes a list of specific vehicles other than the eighteen involved here. That list would obviously tend to lead a file-searcher to assume that only the listed vehicles are covered by the financing statement. Section 9-402 of the U.C.C. calls for a financing statement "indicating the types, or describing the items, of collateral." Ind.Code § 26-1-9-402(1) (emphasis added). While the description "Used Car Inventory" standing by itself would presumably constitute an adequate description covering the later-acquired cars, used in conjunction with a specific list it imparts a wholly different meaning. The description in the Bank's financing statement cannot reasonably be said to cover after-acquired inventory without the danger of seriously misleading a potential searcher. See Clark, supra, p 2.09[b], at 2-91-92.
 
 
 11
 We conclude that only Chrysler Credit had a perfected security interest in the eighteen used cars. The district court therefore erred in awarding the proceeds from the sale of the cars, $121,040, to the Bank.
 
 
 12
 Chrysler Credit's other two arguments concern the disposition of two pieces of real property. The first property, located at 309 South Monticello (the "Exhaust Works" property) was the dealership's former premises, and the second property, located at 820 South Monticello (the dealership property), was the dealership's subsequent location. The Bank held a first mortgage covering both pieces of property, and two other defendants, Mathew and Marilyn Swanson, had a second mortgage on the Exhaust Works property only. During the course of the proceedings in the district court, the Exhaust Works property was sold. The sale proceeds, $40,799, were placed in escrow by the Bank for the benefit of the Swansons. Shortly thereafter, the dealership property was sold together with the dealership's automotive parts inventory, equipment, fixtures and other items, for the gross sum of $215,000. No allocation of the purchase price was made between real estate and personal property. From this $215,000 sum, the district court awarded the Bank $148,000 to pay off the balance on the Bank's mortgage and $20,500 to pay off a loan on a computer system that the Bank had made to the dealership. The balance of the proceeds from the sale of the dealership property went to the receiver. At the close of the proceedings, the district court ordered all funds in the receiver's possession to go to Chrysler Credit (still leaving Chrysler Credit nearly $200,000 short of full payment on its judgment, which was for $549,275).
 
 
 13
 Chrysler Credit first argues that the $40,799 from the sale of the Exhaust Works property should have been credited against the Bank's mortgage. Then the Bank would have received that much less from the sale of the second property, and the receiver--and ultimately Chrysler Credit--would have received that much more. Apparently the Bank escrowed the $40,799 for the purpose of making payment to the Swansons on their second mortgage. Chrysler Credit argues that the Bank improperly escrowed the funds in order to pay the Swansons ahead of Chrysler Credit. The district court did not rule on this point, although it did declare that Chrysler Credit's interest in the "dealership's assets" was superior to that of the Swansons. It is not clear, however, whether the district court intended to include the previously sold real estate in its declaration.
 
 
 14
 Because Chrysler Credit does not itself have an interest in the real estate at issue, the Swansons, as second mortgagees of the Exhaust Works property, would appear to have priority over Chrysler Credit as to the proceeds from the sale of that property. The Swansons duly recorded their mortgage pursuant to Indiana Code § 32-1-2-16. However, since it is the Bank that has the first mortgage, the Swansons are entitled to proceeds only if there is a surplus on the Bank's primary mortgage. Unfortunately, the issue of surplus is complicated by the fact that the sale of the dealership property (recall that the Bank's mortgage was secured by both properties) was not allocated between real estate and personal property, so it is unclear how much of the $215,000 was paid for the real estate. Assuming, for example, that the Bank had a $148,000 balance on its mortgage (but see below), and that $100,000 of the proceeds from the sale of the dealership property was for real estate, then there would have been no surplus on the Bank's mortgage, for the proceeds from both properties would total only $140,799. In such a case, Chrysler Credit's argument would have merit: the $40,799 escrowed by the Bank should have been credited against its mortgage balance rather than set aside for the Swansons. Since there appears to be no evidence in the record indicating what portion of the proceeds from the dealership property can be allocated to real estate, we must remand for determination based presumably on additional evidence to be adduced. While we leave to the district court the question of what sort of procedure might be necessary for this purpose, some estimate of the real estate price is required to determine whether the Bank had a surplus on its mortgage, and thus whether the Swansons were entitled to partial or full payment on their second mortgage. If the Swansons are not so entitled, then the sum of $40,799 should be paid to Chrysler Credit.
 
 
 15
 Finally, Chrysler Credit argues that the Bank was overpaid on its mortgage and its computer loan. Of the $215,000 from the sale of the dealership property, the Bank was awarded $148,000 on its mortgage and $20,500 on its computer loan. Chrysler Credit points out that the Bank's own documents show the mortgage balance to be only $138,193 and the computer loan balance to be only $16,431. These numbers are generally supported by the testimony of the Bank's president. We are unable to find support in the record for the higher figures, and the Bank does not direct us to any such support. We will therefore remand to the district court, which may receive evidence or otherwise determine these loan balances.
 
 
 16
 The judgment of the district court is VACATED in part and the cause is REMANDED for further proceedings as provided in this opinion.
 
 
 
 [1]
 The parties' initial briefs focused on the earlier security agreements rather than this April 1989 agreement. Because of the lack of prominence given to the later agreement by the parties' briefs, we initially relied solely on the earlier agreements in our decision. On petition for rehearing, Chrysler Credit pointed out the significance of the April 1989 agreement. Although that agreement is not referred to in Chrysler Credit's opening brief, we do not believe that Chrysler Credit has waived it. The agreement is referred to in Chrysler Credit's reply brief, and it was not clear until the Bank filed its initial appellate brief that the Bank would dispute Chrysler Credit's underlying security interest