163 F.3d 570
 33 Bankr.Ct.Dec. 767, Bankr. L. Rep. P 77,854,
37 UCC Rep.Serv.2d 799,
98 Cal. Daily Op. Serv. 9077,
98 Daily Journal D.A.R. 12,691,
3 Cal. Bankr. Ct. Rep. 33
 In re FILTERCORP, INC., Filtercorp Partners Limited
Partnership, Debtor.
Henry PAULMAN, Appellant,
v.
GATEWAY VENTURE PARTNERS III, L.P.; Gateway III Filtercorp,
Inc.; Charles A. Brickman; Donald H. Eskes;
Filtercorp, Inc.; Filtercorp Partners,
L.P.; Meridian Properties, Appellees.
 No. 97-35483.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Aug. 6, 1998.
Decided Dec. 14, 1998.
 
 1
 William J. Murphy, Cairncross & Hempelmann, P.S., Seattle, Washington, for the appellant.
 
 
 2
 Edwin K. Sato, Bucknell Stehlik, Seattle, Washington, and Sheena R. Aebig and Eric S. Carlson, Williams, Kastner & Gibbs, Seattle, Washington, for the appellees.
 
 
 3
 Appeal from the Ninth Circuit Bankruptcy Appellate Panel; Higdon, Meyers and Hagan, Judges, Presiding. BAP No. WW-96-01238-HiMHa.
 
 
 4
 Before: D.W. NELSON and KOZINSKI, Circuit Judges, and SCHWARZER,* Senior District Judge.
 
 SCHWARZER, Senior District Judge:
 
 5
 We must decide whether under Washington law a security agreement that grants an interest in "inventory" or "accounts receivable," without more, presumptively includes after-acquired inventory or accounts receivable. The bankruptcy court and Bankruptcy Appellate Panel (BAP) held that to secure after-acquired property, an express after-acquired property clause is required. We reverse, holding that Washington law would presume security interests in "inventory" and "accounts receivable" to include after-acquired property, absent evidence of intent to the contrary. Applying this rule to the security agreement at issue between Henry Paulman and Filtercorp, Inc., we hold that Paulman had a security interest in after-acquired accounts receivable, but not in after-acquired inventory because the security agreement demonstrated an intent to limit the inventory collateral by referencing an attached inventory listing.
 
 
 6
 We reject Paulman's other claims, in particular that the bankruptcy court's order of sale of Filtercorp, Inc.'s assets is not moot, that the bankruptcy court erred by refusing to subordinate or avoid the claims of other creditors, and that he was improperly denied adequate opportunity for discovery.
 
 FACTS AND PROCEDURAL HISTORY
 
 7
 I. PAULMAN'S LOANS TO FILTERCORP, INC.
 
 
 8
 Filtercorp, Inc. was a Washington corporation which developed and distributed carbonated pads used in the food service industry to filter cooking oils. Beginning in November 1991, the company took out a series of loans from Paulman, an individual salesman, to help fund further development and meet large orders. The loans were short term, ranging from two to three months, and memorialized by promissory notes drafted by Paulman's attorney. The final note-the subject of this litigation-was a three-month note, executed on June 30, 1992, and due September 30, 1992.
 
 
 9
 The June 1992 note provided for the following security:
 
 
 10
 This note is secured by 75,000 shares of Filter Corp. [sic] stock owned by Robin Bernard, the accounts receivable and inventory of Filter Corp. [sic] (See UCC-1 filing and attached inventory listing.) and John Gardner personally.
 
 
 11
 The parties never executed a separate security agreement. However, Paulman perfected his security interest by filing a UCC-1 financing statement on October 5, 1992. The UCC-1 statement identified the collateral as (1) accounts receivable and (2) materials inventory. Despite the note's reference to an inventory listing, none was ever attached to the note or the financing statement.
 
 
 12
 There is no contemporaneous evidence shedding light on whether the parties intended to secure after-acquired inventory or accounts receivable with the June 1992 note. In the course of this litigation, the parties presented conflicting versions of their intent. Paulman claimed that he and Filtercorp, Inc. understood the security interest to attach to future rather than presently-held inventory and accounts receivable so as not to interfere with the company's ability to raise additional capital. Hence, he did not attach the inventory listing. In contrast, Robin Bernard, President of Filtercorp, Inc., stated that in light of the short, three-month term of the loan he did not contemplate an ongoing security interest.
 
 
 13
 Filtercorp, Inc. defaulted on the June 1992 note and Paulman initiated a suit in state court in early October 1992 to enforce it. Filtercorp defended on the ground that the note was usurious. Paulman ultimately prevailed in November 1995 and obtained judgment in the amount of $710,572.81.
 
 
 14
 II. GATEWAY LENDERS' LOANS TO FILTERCORP, INC.
 
 
 15
 In December 1992, while the state court litigation was pending, Filtercorp, Inc. became the general partner in a limited partnership named Filtercorp Partners Limited Partnership (Filtercorp LP), in which several limited partners invested approximately $1.7 million. Filtercorp, Inc. transferred all of its operating assets to Filtercorp LP leaving its interest in the limited partnership as its only significant asset.
 
 
 16
 In early 1995, Filtercorp LP took out a series of loans that are the basis of Paulman's effort to seek equitable subordination or avoidance of competing creditors' claims. On three separate dates, Filtercorp LP borrowed a total of approximately $355,000 from Gateway Venture Lenders III, Charles Brickman and Donald Eskes (collectively Gateway Lenders), all of whom were either limited partners of Filtercorp LP or "insiders" for other reasons. The last loans were obtained on February 24, 1995. On that date, Filtercorp LP issued promissory notes for all the amounts borrowed and backdated each note according to its respective loan date. At the same time, Filtercorp LP granted Gateway Lenders a blanket security interest in all of its assets, specifically including after-acquired property. Gateway Lenders filed a corresponding financing statement on March 1, 1995, perfecting its security interest.
 
 III. BANKRUPTCY PROCEEDINGS
 
 17
 In November 1995, Paulman began efforts to collect on his judgment against Filtercorp, Inc. and Filtercorp LP (collectively, Filtercorp). In response, Filtercorp filed voluntary Chapter 11 petitions and immediately moved for approval to use cash collateral to cover expenses. The court held several cash collateral hearings, the last of which was on January 2, 1996. At that time, Filtercorp informed the court of a pending offer from Gateway Lenders to purchase all of Filtercorp's assets. Approximately one week later, Filtercorp moved to sell most of its assets free and clear of liens. Gateway Lenders' offer consisted of a credit bid of its $380,000 secured debt against all the assets subject to the security interest and $100,000 cash for the unsecured assets. At this point, the proposed sale also included a provision designed to deal with the conflicting liens between Gateway Lenders and Paulman, calling for an escrow of the proceeds from the sale of inventory pending resolution of priority. The next day, January 11, 1996, Filtercorp filed an adversary proceeding to resolve the competing lien claims between Gateway Lenders and Paulman.
 
 
 18
 Paulman filed his opposition to Filtercorp's motion for approval of the sale on February 5, 1996, claiming that the proposed sale was not an arm's-length transaction because the buyers were insiders of Filtercorp. Alternatively, he asked the court for a sixty-day deferral to analyze fully the proposed transaction. However, he did not serve any formal discovery requests or file a motion for a continuance pursuant to Federal Rule of Civil Procedure 56(f), made applicable to bankruptcy proceedings by Federal Rule of Bankruptcy Procedure 7056.
 
 
 19
 At a February 9, 1996 hearing, the court scheduled a hearing on Filtercorp's motion to approve the sale proposal for February 27, 1996, to resolve first the adversary proceeding as well as to give Paulman additional time to come up with a competing offer. The court further found at the February 9 hearing that the assets of the company, appraised at between $400,000 and $600,000, were potentially wasting, and therefore directed the parties to file summary judgment motions on their competing liens and to provide each other with any relevant information, including a receivables list with customer names.
 
 
 20
 The bankruptcy court granted summary judgment to Gateway Lenders, holding that Paulman had no security interest in any of Filtercorp's assets because his liens did not attach to after-acquired property and none of the remaining assets could be traced to the assets in existence at the time that his security interest was created. In particular, the court ruled that there was no security interest in after-acquired inventory or accounts receivable because the note did not expressly grant such an interest. The court also found that it could not determine the intent of the parties when they signed the note because the conflicting declarations of Paulman and Filtercorp, Inc.'s President lacked any evidentiary support. The court went on to find Gateway Lenders' security interest valid and first in priority. It did, however, invalidate as preferential all security interests granted Gateway Lenders for the advances made prior to the signing of the security agreement on February 24, 1995. This left Gateway Lenders with $225,000 of secured debt. Thereafter, Gateway Lenders submitted a credit bid of $225,000 and a cash bid of $225,000. Paulman did not submit a revised bid. The court approved the sale to Gateway Lenders on the terms of its revised bid.
 
 
 21
 Paulman did not seek a stay of the order of sale. Filtercorp completed the sale and transferred the assets to Gateway Lenders, who subsequently transferred the assets to a newly formed corporation called FiberCarb. According to Gateway Lenders and Filtercorp, they have since taken irreversible actions with the proceeds from the inventory and the receivables, including employment of personnel and signing and cancellation of leases.
 
 
 22
 Paulman appealed the order of sale and the summary judgment order. The BAP affirmed the bankruptcy court's decisions. It held the absolute mootness rule precluded Paulman's appeal from the order of sale because (1) Paulman failed to obtain a stay, (2) Gateway Lenders was a good faith purchaser, and (3) Paulman suffered no due process violation because he had made no formal discovery requests. The BAP further held that the summary judgment order was not moot because the issue was separate and distinct from the sale of assets and the panel could fashion effective relief since a significant portion of the sale proceeds were undistributed and could be used to pay Paulman's claim if he prevailed.
 
 
 23
 On the merits, the BAP affirmed the lower court's ruling that parties must include express language in a security agreement in order to attach after-acquired property. The BAP also affirmed the bankruptcy court's rejection of Paulman's arguments that Gateway Lenders' claims should be subordinated or avoided and that he was denied sufficient opportunity to conduct discovery into Filtercorp's business.
 
 
 24
 Paulman appeals the orders of the BAP. We have jurisdiction pursuant to 28 U.S.C. § 158(d) and affirm in part and reverse in part.
 
 DISCUSSION
 I. STANDARD OF REVIEW
 
 25
 We review decisions of the BAP de novo. See Fulkrod v. Savage (In re Fulkrod), 973 F.2d 801, 802 (9th Cir.1992). The bankruptcy court's findings of fact are reviewed for clear error and conclusions of law are reviewed de novo. See id.
 
 II. MOOTNESS
 
 26
 Mootness is a jurisdictional issue reviewed de novo. See Baker & Drake, Inc. v. Public Serv. Comm'n (In re Baker & Drake, Inc.), 35 F.3d 1348, 1351 (9th Cir.1994).
 
 A. Order of Sale
 
 27
 Filtercorp contends that Paulman's challenge of the bankruptcy court's order of sale of assets is moot. We agree. When a sale of assets is made to a good faith purchaser, it may not be modified or set aside unless the sale was stayed pending appeal. See 11 U.S.C. § 363(m) (1994);[1] see also Onouli-Kona Land Co. v. Estate of Richards (In re Onouli-Kona Land Co.), 846 F.2d 1170, 1172 (9th Cir.1988) ("Finality in bankruptcy has become the dominant rationale for our decisions; the trend is towards an absolute rule that requires appellants to obtain a stay before appealing a sale of assets."). Because Paulman did not obtain a stay, he cannot challenge the order of sale.
 
 
 28
 Nevertheless, Paulman argues the absolute mootness rule should not apply because (1) this court can fashion effective relief, (2) Gateway Lenders was not a good faith purchaser, and (3) the sale order is void because he was denied due process. These claims are without merit.
 
 
 29
 First, whether we can fashion effective relief is immaterial. "[F]or [sale of assets] cases in which a court is able to fashion relief, the exception has operated in only one situation: 'where real property is sold to a creditor who is a party to the appeal.' " Onouli-Kona, 846 F.2d at 1172 (quoting Sun Valley Ranches, Inc. v. Equitable Life Assurance Soc'y of the United States (In re Sun Valley Ranches, Inc.), 823 F.2d 1373, 1375 (9th Cir.1987)). Because the Filtercorp assets sold were business assets, not real property, this sale does not fall within the exception.
 
 
 30
 Furthermore, even if "effective relief" were a valid exception to the absolute mootness rule, it would not be feasible here. Undoing the sale would adversely affect entities and individuals not party to the appeal. The physical assets have been moved and transferred to a new corporation. Leases have been signed, employees hired and new liabilities have been incurred in reliance upon the finality of the sale. Marketing rights and inventory have been sold to third parties. Paulman argues that equitable relief would be possible by implementing Gateway Lenders' escrow plan initially proposed when Filtercorp LP sought approval of the sale of its assets. The plan, however, is unavailing now because no escrow was created for the proceeds of the sold inventory, once the bankruptcy court's summary judgment order determined priority.
 
 
 31
 Second, the bankruptcy court found that Gateway Lenders was a purchaser in good faith for all purposes including 11 U.S.C. § 363(m). This finding is not clearly erroneous. A good faith buyer "is one who buys 'in good faith' and 'for value.' " Ewell v. Diebert (In re Ewell), 958 F.2d 276, 281 (9th Cir.1992) (citing In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143, 147 (3d Cir.1986)). "[L]ack of good faith is [typically] shown by 'fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.' " Id. (quoting Community Thrift & Loan v. Suchy (In re Suchy), 786 F.2d 900, 902 (9th Cir.1985)). Although Gateway Lenders comprised insiders, Paulman's allegations of bad faith are unsupported by the record. There is no evidence of collusion between Filtercorp LP and Gateway Lenders to deny him access to information. Furthermore, Paulman was subsequently provided with a receivables report that included the customer names he sought. Paulman was given time and opportunity to construct his own bid and was limited only because the summary judgment ruling denied him priority. Finally, Gateway Lenders' revised bid of approximately $450,000 was for value, given that Filtercorp LP's assets were worth between $400,000 and $600,000 and were wasting.
 
 
 32
 Paulman's claim that he was denied due process because the court did not permit him adequate discovery is belied by his own failure to serve discovery requests and to seek a continuance pursuant to Federal Rule of Civil Procedure 56(f), which is incorporated into Federal Rule of Bankruptcy Procedure 7056.
 
 
 33
 In sum, the sale not having been stayed, Paulman's challenge of the order is moot.
 
 B. Summary Judgment
 
 34
 An appeal from a bankruptcy court's summary judgment order is moot if the appealing party failed to obtain a stay, unless the court can "fashion effective relief." Baker & Drake, 35 F.3d at 1351. If a "practical and equitable" solution is feasible, the appeal is not moot. Id. at 1352.
 
 
 35
 Filtercorp and Gateway Lenders argue that the summary judgment order determining the priority of Paulman's and Gateway Lenders' security interests is so intertwined with the order of sale that it too should be subject to the absolute mootness rule. However, the BAP determined that effective relief was possible without undoing the sale because a substantial portion of the proceeds from the sale of Filtercorp's assets were undistributed. At oral argument before this court, counsel for Filtercorp confirmed that approximately $107,000 remained in the bankruptcy estate. If Paulman were held to be the first secured creditor, "practical and equitable" (albeit incomplete) relief is possible, without affecting the sale of assets, by resort to the funds in the estate. Thus, the appeal from the summary judgment is not moot.
 
 
 36
 III. SUMMARY JUDGMENT RULING ON PAULMAN'S SECURITY INTEREST
 
 
 37
 A bankruptcy court's grant of summary judgment is reviewed de novo. See Danning v. Miller (In re Bullion Reserve), 922 F.2d 544, 546 (9th Cir.1991).
 
 
 38
 Paulman challenges the summary judgment ruling that he did not acquire a security interest in after-acquired property, and is therefore an unsecured creditor of Filtercorp. On this appeal, we must "determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the [bankruptcy] court correctly applied the relevant substantive law." Grimmett v. Brown, 75 F.3d 506, 510 (9th Cir.1996).
 
 
 39
 A. Principles Governing Security Interests in Inventory and
 
 Accounts Receivable
 
 40
 Whether a security agreement creates a lien on particular assets is a question of state law. See Butner v. United States, 440 U.S. 48, 55, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). Because no reported decisions of Washington courts or federal courts interpreting Washington law have answered the question whether a security agreement that grants an interest in "inventory" or "accounts receivable," without more, extends to after-acquired property, we must determine how Washington's highest court would resolve the issue. See Dimidowich v. Bell & Howell, 803 F.2d 1473, 1482 (9th Cir.1986) ("Where the state's highest court has not decided an issue, the task of the federal courts is to predict how the state high court would resolve it."), modified on denial of reh'g, 810 F.2d 1517 (9th Cir.1987).
 
 
 41
 Whether security interests in "inventory" presumptively include after-acquired property under Washington law came before us in Stoumbos v. Kilimnik, 988 F.2d 949, 954-56 (9th Cir.1993). We acknowledged the existence of a split of authority on whether a security interest in inventory or receivables automatically extended to after-acquired inventory or receivables despite the absence of an after-acquired property clause, but, on the facts of the case, did not have to decide the issue. See id. at 955-56. We now hold that if the issue came before the Washington Supreme Court, it would hold that security interests in "inventory" and "accounts receivable" presumptively include after-acquired inventory and receivables, subject to rebuttal by evidence that the parties intended otherwise.
 
 
 42
 Courts disagree over what terms are required in a security agreement to cover after-acquired inventory and accounts receivable.[2] A minority of jurisdictions require express language evidencing the parties' intent to cover after-acquired inventory or accounts receivable. See, e.g., In re Middle Atl. Stud Welding Co., 503 F.2d 1133, 1135-36 (3d Cir.1974) (applying Delaware law); Covey v. First Nat'l Bank (In re Balcain Equip. Co.), 80 B.R. 461, 462 (Bankr.C.D.Ill.1987) (applying Illinois law); In re Taylored Prods., Inc., 5 U.C.C. Rep. Serv. 286, 289-91 (Bankr.W.D.Mich.1968) (applying Michigan law). These courts view the Uniform Commercial Code provision concerning after-acquired property, U.C.C. § 9-204 (codified at Revised Code of Washington section 62A.9204),[3] as contemplating express after-acquired property clauses. See Middle Atlantic, 503 F.2d at 1135-36; Balcain Equip., 80 B.R. at 462. They reason that it is "neither onerous nor unreasonable to require a security agreement to make clear its intended collateral." Middle Atlantic, 503 F.2d at 1136. To do so simplifies the interpretation of security agreements and provides more precise notice to third parties of the extent of a perfected security interest in the debtor's property. See id. (noting that a "subsequent lender might expect the parties to make explicit an intention to include this kind of property, both for precision and because of the [pre-U.C.C.] law's historic hostility" to floating liens). In these jurisdictions, a grant of a security interest in "inventory" or "accounts receivable," without more, is insufficient to include after-acquired property.
 
 
 43
 However, we find more persuasive the contrary position, adopted by the majority of jurisdictions, that a security interest in inventory or accounts receivables presumptively includes an interest in after-acquired inventory or accounts receivables, respectively. See, e.g., National Bank v. West Tex. Wholesale Supply Co. (In re McBee), 714 F.2d 1316, 1330-31 (5th Cir.1983) (applying Texas law); Claytor v. Shenandoah Warehouse Co. (In re Shenandoah Warehouse Co.), 202 B.R. 871, 875 (Bankr.W.D.Va.1996) (applying Virginia law); In re American Family Marketing Corp., 92 B.R. 952, 954 (Bankr.M.D.Fla.1988) (applying Florida law); Provident Hosp. & Training Ass'n v. GMAC Mortgage Co. (In re Provident Hosp. & Training Ass'n), 79 B.R. 374, 380 (Bankr.N.D.Ill.1987) (applying Illinois law);[4] In re Nickerson & Nickerson, Inc., 329 F.Supp. 93, 96 (D.Neb.) (applying Missouri law), aff'd, 452 F.2d 56 (8th Cir.1971); Frankel v. Associates Fin. Servs. Co., 281 Md. 172, 377 A.2d 1166, 1168 (Md.Ct.App.1977) (applying Maryland law); Kuemmerle v. United N.M. Bank at Roswell, N.A., 113 N.M. 677, 831 P.2d 976, 979-80 (N.M.1992) (applying New Mexico law); see also Sims Office Supply, Inc. v. Ka-D-Ka, Inc. (In re Sims Office Supply, Inc.), 83 B.R. 69, 72-73 (Bankr.M.D.Fla.1988) (applying Florida law); In re Fibre Glass Boat Corp., 324 F.Supp. 1054, 1056 (S.D.Fla.) (applying Florida law), aff'd, 448 F.2d 781 (5th Cir.1971). The rationale for this position rests on the unique nature of inventory and accounts receivable as "cyclically depleted and replenished assets." Stoumbos, 988 F.2d at 956; see also Shenandoah Warehouse, 202 B.R. at 875 (noting "revolving nature of receivables in most businesses"); Nickerson & Nickerson, 329 F.Supp. at 96 ("Inventory is like a river, the water in which continually flows, rises and falls, but which always constitutes a river.") (citing Ray D. Henson, "Proceeds" Under the Uniform Commercial Code, 65 Colum. L.Rev. 232 (1965)). Because inventory and accounts receivable are constantly turning over, "no creditor could reasonably agree to be secured by an asset that would vanish in a short time in the normal course of business." Stoumbos, 988 F.2d at 955 (citing American Employers Ins. Co. v. American Sec. Bank, 747 F.2d 1493, 1501 (D.C.Cir.1984)); see also Fibre Glass Boat, 324 F.Supp. at 1056 ("Surely the creditor would not enter into a financing arrangement secured by collateral fixed on a particular date, when the collateral by its nature would be constantly changing."). Essentially, a floating lien on inventory and accounts receivable is presumed because the collateral is viewed in aggregate as a shifting body of assets. See Nickerson & Nickerson, 329 F.Supp. at 96 ("[I]nventory subject to a security agreement should be looked upon as a single entity and not as [a] collection of individual items.").
 
 
 44
 Commentators support the majority position. See, e.g., 8A Ronald A. Anderson, Anderson on the Uniform Commercial Code § 9-204:11 at 896 (3d ed. 1996) ("When the collateral is of such nature that it is continually changing, a security interest in the collateral covers after-acquired property even though there is no express after-acquired property clause."); Barkley Clark, The Law Of Secured Transactions Under The Uniform Commercial Code p 2.09 [b] at 2-98 n. 338 (1993) ("The best rule for the courts is to excuse any reference to after-acquired property in the financing statement, but to draw the line in the security agreement according to real expectations in the commercial world; inventory, accounts, and farm products should not require inclusion of after-acquired property clauses in the security agreement, while equipment or general intangibles should."); Ray D. Henson, Secured Transactions Under the Uniform Commercial Code 281 n. 57 (2d ed. 1979) ("Where collateral, such as inventory or accounts, is constantly changing, the collateral can be analogized to [a][r]iver.... When the collateral changes, we trace the original security interest into the proceeds back into the substituted collateral, and so on, so that the security interest is continuous and continuously perfected.") (citations omitted).
 
 
 45
 The Uniform Commercial Code also provides support. The Official Comment to U.C.C. section 9-204 explains that the code accepts the validity of floating liens.[5] Nothing in the comments mandates a specific statement to secure after-acquired property. Moreover, U.C.C. section 9-110 provides that a security agreement need not make a specific description of the covered collateral so long as it "reasonably identifies what is described." Wash. Rev.Code § 62A.9-110 (1995). Finally, the presumption of a floating lien on inventory and accounts receivable is consistent with the mandate that the U.C.C. be "liberally construed and applied to promote its underlying purposes and policies." Wash. Rev.Code § 62A.1-102(1) (1995); see also 8 William D. Hawkland et al., Uniform Commercial Code Series § 9-204:1, at Art. 9-1118 (1997) ("The intent of the drafters was to recognize and liberalize the rules surrounding after-acquired property clauses....").
 
 
 46
 The BAP rejected the presumption that security interests in inventory and accounts receivable automatically include after-acquired property, in part on the ground that the cases adopting this position involved language in the security agreement demonstrating that the parties intended to cover a broad class of collateral, such as "all inventory" or "all accounts." While parties have often signaled their intent through use of the word "all" in the security agreement, this is not true of every case endorsing the presumption. Compare Sims Office Supply, 83 B.R. at 70 (security agreement granting security interest in "all inventory"), and Fibre Glass Boat, 324 F.Supp. at 1055 (security agreement granting security interest in "all inventory used in the production of boats"), with Shenandoah Warehouse, 202 B.R. at 872, 875 (security agreement granting security interest in "accounts receivable" included after-acquired receivables despite fact that it did not say "all"), and American Family Mktg., 92 B.R. at 953-54 (security agreement granting security interest in "65% of the value of the inventory" included after-acquired inventory).
 
 
 47
 More importantly, the majority of courts and commentators reason that the presumption of a floating lien on inventory and accounts receivable is not created by particular language but rather springs from an appreciation of the cyclical nature of the collateral itself. This is confirmed by the decision on which the BAP placed its principal reliance, American Employers Ins. Co. v. American Sec. Bank, 747 F.2d 1493 (D.C.Cir.1984) (applying Maryland law). The American Employers court acknowledged that inventory and accounts receivable are unique types of collateral, describing them as "constantly turning over, and ... usually conceived of as a single entity." Id. at 1500. Drawing on cases considering financing statements lacking explicit after-acquired property clauses, the court noted that "the description of the collateral as 'accounts receivable' sufficiently identifie[s] the collateral as to put a prospective creditor on notice of the probability that the security agreement did embrace present and future accounts receivable. Any other view would ignore the realities of the world of financing." Id. (quoting South County Sand & Gravel Co. v. Bituminous Pavers Co., 106 R.I. 178, 256 A.2d 514, 517 (R.I.1969) (internal quotation marks omitted)). Further, the American Employers court reasoned that "[t]he addition of the word 'future' to 'accounts receivable and inventory' would not seem to help an interested party in determining the status of the debtor." Id. (quoting In re Platt, 257 F.Supp. 478, 481 (E.D.Pa.1966) (internal quotation marks omitted)). Turning to the security agreement at issue, the American Employers court held that "[i]t is reasonable to read a security agreement granting an interest in all inventory or receivables to include after-acquired inventory or receivables." Id. at 1501. And although the court also looked to evidence of the parties' subjective intent to include after-acquired collateral, the rationale of the decision is consistent with a presumption favoring inclusion of after-acquired collateral. Indeed, some jurisdictions have interpreted American Employers as endorsing the presumption. See Sims Office Supply, 83 B.R. at 72 (citing American Employers for the proposition that "[t]he modern trend suggests that a security interest in after-acquired property is to be automatically presumed when the collateral is described in such generic terms as 'accounts receivable,' ... or 'inventory' "); Kuemmerle, 831 P.2d at 979-80 (citing American Employers for the proposition that "[a] majority of the courts addressing this issue have concluded that a security interest in inventory also includes after-acquired inventory unless the security agreement clearly indicates the contrary result is intended").
 
 
 48
 Some courts have approached the issue of after-acquired property by asking whether a reasonable person viewing the security agreement "would recognize that the parties intended to secure after acquired inventory" or accounts receivable. In re Gary & Connie Jones Drugs, Inc., 35 B.R. 608, 611 (Bankr.D.Kan.1983) (applying Kansas law); see also Kubota Tractor Corp. v. Citizens & S. Nat'l Bank, 198 Ga.App. 830, 403 S.E.2d 218, 224 (Ga.Ct.App.1991) (applying Georgia law). Yet courts applying the reasonable person test "invariably find that the parties intended to secure after acquired inventory [or accounts receivable] despite the absence of an after acquired clause" because the assets are "constantly flowing in and out of the debtor's possession." Gary & Connie Jones Drugs, 35 B.R. at 611. Thus, this approach essentially collapses into the presumption that after-acquired inventory and accounts receivable are covered.
 
 
 49
 The presumption that a grant of a security interest in inventory or accounts receivable includes after-acquired property is of course rebuttable. For example, the presumption would be overcome where the security agreement language itself manifests an intent to limit the collateral to specific identified property, where a party presents clear evidence of contemporaneous intent to limit the collateral, or where the debtor can demonstrate that it was engaged in a type of business where the named collateral, whether inventory or receivables, does not regularly turn over so that the rationale for the presumption does not apply. See, e.g., Stoumbos, 988 F.2d at 955-56 (no need to decide if inventory automatically includes after-acquired inventory because security agreement at issue granted an interest in "inventory ... on hand at May 1, 1982"); Sims Office Supply, 83 B.R. at 73-74 (security agreement with provisions relating to debtor's sale of collateral, creditor's inspection of collateral, and substitution of collateral was sufficiently ambiguous to preclude summary judgment despite presumption that inventory and accounts receivable include after-acquired property); see also Chrysler Credit Corp. v. Knebel Chevrolet-Buick, Inc., 976 F.2d 1012, 1015 (7th Cir.1992) (in a financing statement, the description of collateral as "used car inventory" would presumptively include after-acquired cars, but when used in conjunction with a list of specific cars, the statement could not reasonably be said to cover after-acquired inventory).
 
 
 50
 We conclude that were the issue to come before the Washington Supreme Court, it would hold that after-acquired collateral is presumptively covered by a security agreement referencing "inventory" or "accounts receivable." Because Washington has recognized that "the Uniform Commercial Code was promulgated in order to develop uniformity in commercial transactions," Schroeder v. Fageol Motors, Inc., 86 Wash.2d 256, 544 P.2d 20, 24 (Wash.1975) (en banc), it can be expected to follow the rule adopted by a majority of the jurisdictions that have addressed the issue and that conforms to commercial practice and common sense.
 
 
 51
 B. Security Agreement Between Paulman and Filtercorp
 
 
 52
 Applying the foregoing analysis to the security agreement between Paulman and Filtercorp, we reach different results with respect to accounts receivable and inventory. The note (which serves as the security agreement) states that it was secured by "the accounts receivable and inventory of Filter Corp. [sic] (see UCC-1 filing and attached inventory listing.)." While the presumption that after-acquired property is included stands unrebutted as to accounts receivable, it is rebutted for inventory by the reference to the attached inventory listing.
 
 
 53
 Under the approach we adopt, the reference to "accounts receivable" presumptively includes after-acquired accounts receivable. The bankruptcy court found the opposing declarations of Paulman and Filtercorp, Inc.'s President as to their contemporaneous intent to be inconclusive. That finding of fact is not clearly erroneous. There is no other evidence of intent in the record. Therefore, we hold that Paulman has a security interest in after-acquired accounts receivable of Filtercorp. That security interest was perfected when Paulman filed a UCC-1 financing statement before other creditors and before Filtercorp filed for bankruptcy.[6]
 
 
 54
 With respect to the security interest in inventory, the note referenced an "attached inventory listing" which, however, was never attached to either the note or the financing statement. Paulman claims that he did not attach the listing because he agreed with Filtercorp, Inc.'s President Bernard to create a security interest in inventory in general, including after-acquired inventory. Bernard, in contrast, claims that after-acquired inventory was never discussed by the parties prior to entering into the loan agreement and that he did not intend to attach after-acquired property given the short term nature of the loans. The bankruptcy court's finding that this conflicting evidence is inconclusive is not clearly erroneous. Thus, we are left with the language of the note itself.
 
 
 55
 When, as in this case, a security interest in inventory is described by reference to a list, it suggests an intent to limit the collateral rather than cover inventory as a floating mass including after-acquired inventory. See Chrysler Credit, 976 F.2d at 1014-15 (financing statement identifying collateral as "Used Car Inventory; See Attachment 'A' " evidenced an intent to limit inventory rather than include after-acquired inventory). Yet, reference to an attached list does not preclude securing after-acquired collateral when the agreement or the listing demonstrate an intent to do so. See Coats State Bank v. Grey (In re Grey), 902 F.2d 1479, 1481 (10th Cir.1990) (security agreement granting interest in "all debtor's livestock, hog equipment, farm machinery, and farm equipment as listed, to be updated monthly" created an interest in after-acquired property because the requirement of monthly updating, in addition to other facts, evidenced an intent to attach after-acquired property); John Deere Co. v. Butler County Implement, Inc., 232 Kan. 273, 655 P.2d 124, 129-30 (Kan.1982) (security agreement covering "inventory per ... Exhibit 'B' " did not create interest in after-acquired inventory, whereas security agreement in "inventory and accounts receivable now owned and hereafter acquired by Borrower.... SEE ATTACHED EXHIBIT 'A' " did create interest in after-acquired property by the inclusion of an explicit after-acquired property clause).
 
 
 56
 Here, the Paulman-Filtercorp note referenced an inventory listing, which rebuts the presumption that after-acquired inventory is attached, and failed to demonstrate any particular intent to cover after-acquired inventory. The note's ambiguity regarding the security interest in inventory must be construed against Paulman, the drafter of the note. See McMahan & Baker, Inc. v. Continental Cas. Co., 68 Wash.App. 573, 843 P.2d 1133, 1136 (Wash.Ct.App.1993) (ambiguous contract language is construed against the drafter). We conclude that Paulman does not have a security interest in after-acquired inventory of Filtercorp.[7]
 
 
 57
 Accordingly, we reverse the summary judgment with respect to Paulman's lien on accounts receivable, including after-acquired accounts receivable, of Filtercorp, and affirm with respect to his lien on inventory.
 
 
 58
 IV. EQUITABLE SUBORDINATION OR AVOIDANCE OF GATEWAY LENDERS' CLAIMS
 
 
 59
 Paulman argues that the bankruptcy court should have equitably subordinated the claims of Gateway Lenders or, in the alternative, avoided them as preferential transfers. Neither argument has merit.
 
 
 60
 A bankruptcy court's decision regarding equitable subordination pursuant to 11 U.S.C. § 510(c)(1) is reviewed for abuse of discretion. See Christian Life Ctr. Litig. Defense Comm. v. Silva (In re Christian Life Ctr.), 821 F.2d 1370, 1376 (9th Cir.1987). We find none here. "Equitable subordination requires that: (1) the claimant who is to be subordinated has engaged in inequitable conduct; (2) the misconduct results in injury to competing claimants or an unfair advantage to the claimant to be subordinated; and (3) subordination is not inconsistent with bankruptcy law." Spacek v. Thomen (In re Universal Farming Indus.), 873 F.2d 1334, 1337 (9th Cir.1989) (citing Wardley Int'l Bank, Inc. v. Nasipit Bay Vessel, 841 F.2d 259, 263 (9th Cir.1988)). Paulman asserts that Gateway Lenders and Filtercorp engaged in inequitable conduct because Gateway Lenders made the loans to Filtercorp LP while it was insolvent and Gateway Lenders backdated the security agreements to apply to loans made a month earlier. The fact that Filtercorp was insolvent is insufficient to require subordination of claims. See Wood v. Richmond (In re Branding Iron Steak House), 536 F.2d 299, 302 (9th Cir.1976). "[A] Bankruptcy Court is a court of equity, and subordination requires some showing of suspicious, inequitable conduct beyond mere initial undercapitalization of the enterprise." Id. The case relied on by Paulman, Summit Coffee Co. v. Herby's Foods, Inc. (In re Herby's Foods, Inc.), 2 F.3d 128 (5th Cir.1993), is readily distinguishable. In Herby's Foods the insider creditors made no capital contributions of any kind to the debtor corporation and executed the security agreement almost a year after the loans were made. See id. at 130. By contrast, Gateway Lenders injected capital of $1.7 million into Filtercorp LP prior to loaning the company $355,000. In addition, it executed the security agreement at issue within two months of the time it made its initial loans to Filtercorp LP and on the same day that it made the final loan.
 
 
 61
 With respect to the backdating of the security agreements, both the bankruptcy court and the BAP found Gateway Lenders' position that the loans were part of a single continuous loan transaction credible. Nevertheless, the bankruptcy court avoided all of the security interests as preferential transfers except that which attached on the date the last advance was made, February 24, 1995, which rendered the backdating of the other security agreements immaterial.
 
 
 62
 Paulman's argument that the February 24, 1995, security interest should also have been avoided under 11 U.S.C. § 547 as a preferential transfer for antecedent debt similarly fails. Although Gateway Lenders filed its financing statement on March 1, 1995, five days after the creation of the security interest, the bankruptcy court correctly concluded that the transfer was a substantially contemporaneous exchange for new value. See 11 U.S.C. § 547(c)(1)(A) (1994) (a transfer may not be avoided to the extent that it was "intended by the debtor and the creditor ... to be a contemporaneous exchange for new value given to the debtor"); id. § 547(e)(2)(A) (1994) (a transfer is made "at the time such transfer takes effect between the transferor and transferee, if such transfer is perfected at, or within 10 days after, such time").
 
 
 63
 V. ADEQUATE OPPORTUNITY TO CONDUCT DISCOVERY
 
 
 64
 Paulman claims that the bankruptcy court improperly denied him adequate opportunity to conduct discovery in preparation for the summary judgment proceedings. A lower court's decision not to permit further discovery is reviewed for abuse of discretion. See Qualls v. Blue Cross of California, Inc., 22 F.3d 839, 844 (9th Cir.1994). Here, Paulman never served formal discovery or sought a continuance for further discovery, and the court found that Filtercorp's assets were wasting. The bankruptcy court did not abuse its discretion.
 
 VI. CONCLUSION
 
 65
 We REVERSE in part and AFFIRM in part and REMAND to the bankruptcy court for proceedings consistent with this opinion.
 
 
 
 *
 Honorable William W Schwarzer, Senior United States District Judge for the Northern District of California, sitting by designation
 
 
 [1]
 11 U.S.C. § 363(m) (1994) states:
 The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.
 
 
 [2]
 The analysis applicable to security agreements differs from that applicable to financing statements. In contrast to the split of authority concerning the language needed to secure after-acquired property in a security agreement, it is well established that a financing statement need not refer explicitly to after-acquired property for an interest in such property to be perfected. See U.C.C. § 9-204 cmt. 5 (1972) ("There is no need to refer to after-acquired property ... in the financing statement.")
 
 
 [3]
 The relevant portion of the statute reads:
 (1) Except as provided in subsection (2), a security agreement may provide that any or all obligations covered by the security agreement are to be secured by after-acquired collateral.
 (2) No security interest attaches under an after-acquired property clause to consumer goods other than accessions when given as additional security unless the debtor acquires rights in them within ten days after the secured party gives value.
 Wash. Rev.Code § 62A.9-204 (1995) (citation omitted).
 
 
 [4]
 Both Provident, 79 B.R. at 379-80, and Covey, 80 B.R. at 462, purport to apply Illinois law but reach opposite conclusions
 
 
 [5]
 The Official Comment states that:
 This Article accepts the principle of a "continuing general lien." It rejects the doctrine--of which the judicial attitude toward after-acquired property interests was one expression--that there is reason to invalidate as a matter of law what has been variously called the floating charge, the free-handed mortgage and the lien on a shifting stock....
 The widespread nineteenth century prejudice against the floating charge was based on a feeling, often inarticulate in the opinions, that a commercial borrower should not be allowed to encumber all his assets present and future, and that for the protection not only of the borrower but of his other creditors a cushion of free assets should be preserved. That inarticulate premise has much to recommend it. This Article decisively rejects it not on the ground that it was wrong in policy but on the ground that it was not effective.
 U.C.C. § 9-204 cmt. 2 (1972).
 
 
 [6]
 The financing statement referred to the collateral as "accounts receivable" without any express reference to after-acquired property. This omission is immaterial because financing statements need not refer explicitly to after-acquired property for such property to be secured and perfected. See note 2 supra
 
 
 [7]
 Because Paulman has no interest in after-acquired inventory and the bankruptcy estate does not include any original inventory or assets traceable to original inventory, he cannot recover from the bankruptcy estate by reason of his security interest in Filtercorp's inventory. Thus, we need not determine two other issues related to his security interest in inventory: Whether the original description in the security agreement was fatally flawed by the failure to attach the referenced inventory listing, and whether the discrepancy between the description of Paulman's interest in the note ("inventory of Filter Corp. [sic] (see UCC-1 filing and attached inventory listing") and financing statement ("materials inventory") limits his security interest