
**NOT FOR PUBLICATION**

# UNITED STATES BANKRUPTCY APPELLATE PANEL
## OF THE NINTH CIRCUIT

| | |
|---|---|
| In re:<br>FAB 5 LLC,<br><br>      Debtor. | BAP Nos. CC-24-1168-SCF<br>            CC-24-1178-SCF<br>(Consolidated Appeals) |
| FAB 5 LLC,<br>      Appellants,<br>v.<br>CAROLYN A. DYE, Chapter 7 Trustee;<br>UNITED STATES TRUSTEE, LOS<br>ANGELES; TUCALOTA CREEK<br>RANCH, INC.; COWLEY<br>PERFORMANCE HORSES,<br>      Appellees. | Bk. No. 2:24-bk-15398-SK<br><br>**MEMORANDUM**[*] |

Appeal from the United States Bankruptcy Court
for the Central District of California
Sandra R. Klein, Bankruptcy Judge, Presiding

Before: SPRAKER, CORBIT, and FARIS, Bankruptcy Judges.

## INTRODUCTION

Chapter 7[1] debtor FAB 5 LLC ("FAB 5") appeals from an order

---

[*] This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have, *see* Fed. R. App. P. 32.1, it has no precedential value, *see* 9th Cir. BAP Rule 8024-1.

[1] Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532, all "Rule" references are to the Federal Rules

authorizing the chapter 7 trustee to sell or abandon seven horses. FAB 5, through attorney Carolyn Lindholm, opposed the sale motion and has appealed the resulting sale order. However, because the bankruptcy court properly determined that the purchasers of the horses qualified as good faith purchasers under § 363(m), and that finding was not clearly erroneous, this appeal is moot.

Even if we were to reach the merits of this appeal, we would AFFIRM. We agree with the bankruptcy court that FAB 5 is judicially estopped from denying its ownership of the horses. In the alternative, the evidence in the record supports the bankruptcy court's finding that the horses were property of the bankruptcy estate and that FAB 5's principal Robert Lindholm did not own them personally. We also reject FAB 5's contention that the bankruptcy court violated its due process rights. Under all the relevant circumstances, FAB 5 had ample opportunity to be heard and present its positions in opposition to the sale and to the court's good-faith determination. Despite having ample notice and opportunity to do so, it failed to present any evidence that would have justified a different result.

Accordingly, we DISMISS these consolidated appeals based on mootness. In the alternative, we AFFIRM.

---

of Bankruptcy Procedure, all "Civil Rule" references are to the Federal Rules of Civil Procedure, and all "LBR" references are to the Local Bankruptcy Rules of the particular district identified.

## A. Pre-bankruptcy litigation and the bankruptcy filing.

Prepetition, the Lindholms and FAB 5 were embroiled in litigation with, among others, Tucalota Creek Ranch ("TCR") and Cowley Performance Horses ("Cowley"). TCR and Cowley claimed that FAB 5 was indebted to them, respectively, for boarding and training five stallions that the Lindholms imported from Europe. The Lindholms imported the stallions with the intent to breed and compete them in dressage competitions. TCR and Cowley (jointly, the "Lienholders") claimed liens against the horses for the unpaid debts.

According to Robert,[3] he formed and managed FAB 5 to hold ownership of the stallions and operate the horse breeding business. FAB 5 disputed the amount owed to the Lienholders and asserted that they did not adequately board or train the stallions. FAB 5 also boarded two older geldings with TCR. They also were swept up in the same litigation.

In early July 2024, after the Lienholders sought leave from the state court to conduct a lien sale of the horses, Carolyn filed a skeletal chapter 11 subchapter V petition on behalf of FAB 5. The seven-page bankruptcy filing

---

[2] We exercise our discretion, when appropriate, to take judicial notice of documents electronically filed in the underlying bankruptcy case and adversary proceeding. *See Atwood v. Chase Manhattan Mortg. Co. (In re Atwood)*, 293 B.R. 227, 233 n.9 (9th Cir. BAP 2003).

[3] We refer to the Lindholms by their first names for ease of reference. No disrespect is intended.

did not include any schedules, but it did identify two (and only two) creditors: the Lienholders. The horses were not specifically listed in the filing. However, Carolyn answered "yes" in response to question 12 of the petition, "[d]oes the debtor own or have possession of any real property or personal property that needs immediate attention?" Carolyn further identified the location of these "perishable assets" as TCR's ranch. The Lindholms never have disputed that this response referenced FAB 5's ownership of the horses, which were the only assets held at TCR's ranch in which FAB 5 ever asserted an interest.

On July 19, 2024, ten days after the bankruptcy filing, the U.S. Trustee moved to dismiss or convert the case based on FAB 5's failure to comply with multiple subchapter V requirements. FAB 5 opposed the motion. In its six-page opposition, again filed by Carolyn, FAB 5 did not deny its noncompliance. Instead, it attributed the noncompliance to the July 27, 2024 death of the accountant who allegedly handled the financial aspects of FAB 5's breeding business. It also claimed that it was on the verge of hiring qualified bankruptcy counsel.[4]

More importantly for purposes of this appeal, Carolyn specifically represented in the opposition that, "[t]he 5 stallions [are] owned by Fab 5, LLC." Similarly, Carolyn filed on July 22, 2024, a motion on behalf of FAB 5

---

[4] Carolyn is an attorney practicing law in California, but her self-reported area of expertise is medical malpractice.

seeking turnover of all seven horses then held by TCR.[5] In the turnover motion, Carolyn stated that the motion concerned: "[t]he 7 horses **owned by FAB 5, LLC** and being held at [TCR]." (Emphasis added.) Accompanying the turnover motion was a supporting "Declaration of Debtor," which Robert signed specifically on behalf of FAB 5, in which he stated under penalty of perjury that the debtor was the "owner" of the horses.

## B.    Conversion to chapter 7 and the motion to sell.

FAB 5 never filed any schedules or a statement of financial affairs as required under § 521(a). In mid-August 2024, the court converted the case to chapter 7, and Carolyn Dye was appointed to serve as chapter 7 trustee. Within a month of her appointment, Dye moved to sell or abandon all seven horses. The sale motion was based in part on a stipulation between Dye and the Lienholders. The stipulating parties agreed that upon the bankruptcy court's approval of the stipulation and Dye's sale motion, Dye would be permitted to hold an auction sale on TCR's premises and to provide access to potential bidders for purposes of inspecting the horses. The stipulating parties also agreed upon the distribution of the sale proceeds. The estate's administrative expenses would be paid first, but only up to 20% of the proceeds. The next 70% of the proceeds would be

---

[5] The specific title of this motion was "Motion for Order Establishing Adequate Protection, Including Procedures to Return Seized Personal Property." But the key relief sought in the motion was based on § 542(a), governing turnover of estate property.

paid in satisfaction of the Lienholders' claims. And the final 10%—and any amount of proceeds in excess of the amount necessary to satisfy the Lienholders' claims—would be distributed to FAB 5's unsecured creditors. Finally, Dye would formally abandon any of the horses not sold at the auction and would support relief from stay in favor of TCR to proceed with its state law remedies as to the abandoned horses.

The sale motion summarized the Lindholms' purchase of the five stallions and the history of lawsuits involving parties who provided transportation, boarding, and training for the stallions. According to Dye, at the time of their purchase in 2017, Carolyn owned the stallions. However, by the time the Lindholms sued Hacienda Del Valle Corp. in 2021 and 2022 over the boarding and training services it provided, Carolyn was alleging that FAB 5 owned the stallions. Later, in April 2024, in their litigation with the Lienholders, Carolyn filed a motion on behalf of herself and FAB 5 in which she stated that "the seven horses [are] owned by FAB 5, LLC . . . ."

As for the sale of the horses, Dye first explained how the physical condition and limited training of the stallions affected their value and how they could be sold. She stated that, in the process of investigating the issue, she had consulted with two horse appraisers who had given their opinions as to the horses' value. She additionally explained that both the lack of available funds and continued administrative expenses to board and maintain the horses militated in favor of holding an auction at TCR's ranch

in an expeditious manner. Dye opined that under the existing circumstances such an auction was the most likely means to achieve the highest and best net return for the estate.

Dye proposed to personally conduct the auction at the ranch with the prevailing bidder paying all cash and receiving no warranty as to the horses' value or utility. Dye further proposed that the initial bid for each horse would be determined based on her consultations with the appraisers, and that prospective bidders could, upon request, inspect the horses in advance. She also stated that she would market the horses through her available contacts and would conduct the sale within 30 days of bankruptcy court approval.

## C.    The sale opposition and the motion to dismiss.

FAB 5, again acting through Carolyn, opposed the sale motion. Carolyn also filed a motion to dismiss the bankruptcy case. Both the sale opposition and the dismissal motion told the same story. Carolyn and Robert declared under penalty of perjury that, "[u]ntil recently," they believed that FAB 5 owned all the horses. As they put it, their former accountant—recently deceased—was supposed to transfer title to all seven horses from Robert to FAB 5. According to the Lindholms, they "just learned" the accountant had failed to convey title, so Robert "is still the lawful owner of the horses."[6] Missing from the Lindholms' new version of

---

[6] According to the Lindholms, this explained their myriad prior statements that FAB 5 owned the horses.

events were any specifics regarding precisely what was supposed to have happened, how they learned that it did not happen, when they learned this, from whom they learned this, and under what circumstances. The Lindholms did claim that they possessed title documentation evidencing Robert's personal ownership of the horses. Though they promised to make this documentation available to the court at the time of the sale hearing, they failed to attach any documentation to their opposition.

Dye opposed the motion to dismiss and replied to the sale opposition. In relevant part, she pointed out that despite her repeated requests, the Lindholms had failed to produce any documentation to show that FAB 5 did not own the horses. As Dye further noted, it was undisputed that for years the Lindholms, in myriad contexts, held out FAB 5 as the owner of the horses. As examples, Dye pointed to exhibits 5 and 6 attached to TCR's proof of claim. Exhibits 5 and 6 include boarding agreements between TCR and FAB 5—signed by Carolyn—in which she stated that FAB 5 owned the horses. Dye also referred to court determinations in other litigation that Robert had committed bankruptcy fraud and that he qualified as a vexatious litigant. As Dye explained, there was very good reason to doubt the Lindholms' credibility given the lengthy history of their representations that FAB 5 owned the horses and the convenient timing of their "discovery" that the transfer to FAB 5 allegedly never occurred.

**D.    The sale motion hearings.**

The court held its first hearing on the sale motion on October 9, 2024, but it granted a one-week continuance to permit the Lindholms a final chance to avoid the sale by paying all accrued administrative expenses, the Lienholders' claims, and the subchapter V trustee's fees. The court stated that if these preconditions occurred by October 15, 2024, the bankruptcy court would grant the motion to dismiss the bankruptcy case. If the preconditions did not all timely occur, the court said it would rule on the sale motion at the continued sale hearing on October 16, 2024.

At the continued hearing, the court rendered its ruling. As to the ownership issue, it specifically found that at the time of its bankruptcy filing FAB 5 owned the horses.[7] The court relied on the assertion in the bankruptcy petition that FAB 5 had perishable assets located at TCR's ranch, the boarding contracts identifying FAB 5 as owner of the horses, and the turnover motion Carolyn filed for FAB 5 before the conversion of its case to chapter 7. As an alternative to its ownership finding, the court further held that FAB 5 should be judicially estopped from contesting its ownership of the horses in light of the ownership representations the Lindholms made in the bankruptcy petition and in the turnover motion. The court additionally denied as moot the motion to dismiss. Finally, the

---

[7] The court specifically referred to five horses, but it is clear from the entirety of the record that the court meant that all seven horses were property of the FAB 5 bankruptcy estate.

9

court indicated that the § 363(m) issue would be addressed in later proceedings to be held following completion of the sale.

## E. The sale order and FAB 5's appeal.

The court entered its sale order on October 18, 2024. The order reiterated the court's finding that "[t]he Horses are property of the bankruptcy estate and may be sold as provided in the Motion free and clear of any and all liens and encumbrances." The order also specified that any horses not sold at auction "would be deemed abandoned." The order further directed Dye upon completion of the sale to submit to the court evidence to substantiate that the purchaser(s) qualified as good faith purchasers under § 363(m).[8]

On October 29, 2024, Carolyn, as counsel for FAB 5, filed an appeal of the sale order. FAB 5 then moved for a stay pending appeal multiple times. The stay motions were in large part based on Robert's new declaration dated October 28, 2024. In this declaration, Robert claimed to both own and hold a lien against the horses. As for ownership, he reiterated his allegation that he only recently learned that his now-deceased CPA failed to transfer title from himself to FAB 5. He also faulted the court for not asking him about his "ownership documentation" at the sale hearings. But again, the alleged documentation was never attached to any court filing either before

---

[8] The sale order also granted Dye's request under § 363(f) to sell the horses "free and clear of any and all liens and encumbrances." These consolidated appeals do not challenge the relief the court granted under § 363(f).

10

or after the sale hearings. Carolyn failed to calendar FAB 5's stay motions for hearing and ultimately withdrew them.

**F.      Sale of the horses and the subsequent "good faith" proceedings.**

Dye noticed the auction sale for December 7, 2024, by filing a notice of sale on November 13, 2024. After she conducted the sale, she filed multiple declarations regarding what transpired at the time of the auction.

On January 9, 2025, Carolyn filed on behalf of FAB 5 a "demand" for an evidentiary hearing. She questioned whether Dye held a bona fide auction on December 7, 2024, arguing that: (1) the gate to TCR's ranch was locked on December 7, 2024, at the time the auction supposedly was occurring; (2) she was unable to find any sale advertisements published in advance of the sale; (3) a ranch manager at a neighboring ranch "knew nothing" about any auction being held at TCR's ranch; and (4) the price received at auction for the horses sold was inconsistent with a bona fide auction.

On January 24, 2025, Dye formally moved for good faith findings under § 363(m) and renewed her request to file the full results of the sale under seal. Dye included with the motion a new declaration. Dye stated: (1) she conducted the auction on December 7, 2024, at TCR's ranch, in accordance with the court's order granting the sale motion; (2) prior to the auction, she viewed all seven horses and observed that they appeared to be well maintained; (3) bidders and others were given the opportunity to view, and did view, the horses prior to the auction; (4) the two geldings

11

were not sold and were deemed abandoned by the estate; (5) all but one of the five stallions elicited bids from third parties; (6) the successful bidders for two of the stallions were third parties who purchased these stallions for cash; and (7) TCR successfully credit bid for the three remaining stallions.

The U.S. Trustee filed a limited opposition to the good faith finding motion. He pointed out that the current motion was not accompanied by sufficient evidence and suggested that Dye be allowed to supplement the record to specifically address the good faith issue. Carolyn opposed the good faith finding motion on behalf of FAB 5 and reiterated the Lindholms' prior complaints formerly expressed in the opposition to the sale motion. Relevant to the question of good faith, Carolyn repeated her allegations that the auction was a sham. But the opposition did not attach any evidence to support these allegations.

Dye belatedly filed, on February 21, 2025, a 58-page reply to the oppositions, as well as a 506-page request for judicial notice. The reply stated in relevant part:

(1) because the estate lacked any assets other than the horses, time was of the essence in completing the sale in order to minimize the amount of administrative expenses incurred in boarding the horses for an additional length of time;

(2) the absence of estate funds also prevented Dye from placing "fancy ads" in horse magazines;

(3) Dye relied on the available horse appraisals to ensure that the auction yielded fair amounts given the value of the

12

stallions sold;

(4)  Dye caused the following steps to be taken to disseminate news of the auction:

   (a)  videos were taken of the horses going through their paces and were circulated by the Lienholders to contacts who they thought might be interested in bidding;

   (b)  notice of the sale was circulated by "word of mouth" to persons at the highest level of Olympian and International equestrian sports, international and national sale barns, and local successful dressage barns and others;

   (c)  Dye personally contacted someone known to her to train and compete in jumping and dressage events, who later attended the auction and bid for one stallion but ultimately was outbid;

(5)  one of the Lienholders' counsel contacted "a number of individuals" about the upcoming sale, one of whom went to TCR's ranch and rode one of the stallions but subsequently opted to not attend the auction;

(6)  another individual contacted by Lienholders' counsel came to the auction and bid, which resulted in the highest cash price obtained for any of the stallions;

(7)  the other cash buyer of one of the stallions learned of the auction from one of Dye's contacts; and

(8)  in total, the outreach efforts undertaken resulted in

13

between 10 and 15 appointments for pre-auction viewings of the horses and two pre-auction veterinary inspections.

As for the results of the auction, Dye stated in her reply that roughly 15 attendees were present the day of the auction, all of whom walked with her to preview the horses and only one of whom Dye knew personally. Of the two cash buyers, Dye stated there was no known connection to TCR. As to the individual horses sold, Monet sold for TCR's credit bid of $3,700 following competitive bidding.[9] Murano sold for a cash bid of $8,500 following competitive bidding. The sole bid for Moscow was TCR's credit bid of $5,500, for which Moscow was sold. Figaro elicited 17 bids and ultimately sold for $23,000 cash. And T Rex elicited 17 competing bids and ultimately sold for TCR's credit bid of $6,000.

Though Dye submitted her declaration in support of her reply, it did not include the same detail regarding the auction set forth in the reply. Three days later, on February 24, 2025, the court entered its order for admissible evidence.[10] The court observed that both Dye and FAB 5 had

---

[9] Section 363(k) statutorily permits secured creditors to credit bid in a sale of property of the estate unless the court orders otherwise for cause. The sale order did not prohibit credit bids.

[10] Also on February 24, 2025, Carolyn filed on behalf of FAB 5 a motion for an evidentiary hearing. This motion was meant to supersede FAB 5's improperly-filed January 9, 2025 "demand" for an evidentiary hearing. The motion largely reiterated the same allegations and requests for relief set forth in the demand. Carolyn filed a one-page declaration with the motion, but most of the declaration complained about matters not directly relevant to Dye's marketing and sale efforts. Furthermore, she later admitted at the hearing on the good-faith issue that she had no personal knowledge of any of the matters relevant to the good-faith issue.

submitted pleadings containing numerous allegations unsupported by admissible evidence. The court instructed both parties, within roughly 24 hours, to submit evidence to substantiate their allegations. With respect to Dye, the court specifically directed:

> Dye to submit admissible evidence, including a declaration signed under penalty of perjury, substantiating each and every step that she took to advertise the auction and the procedures that she followed to conduct the auction. Such evidence should not refer to any prior filing or any evidence attached to a prior pleading but must contain specific, detailed information regarding what Dye did to publicize and conduct the auction.

In response, Dye filed a six-page declaration in which she largely reiterated the factual detail from her reply memorandum in support of her good faith finding motion. As for FAB 5, Carolyn objected on its behalf to both Dye's late-filed papers and the court's order to provide admissible evidence. Carolyn asserted that there was no way FAB 5, in only 24 hours, reasonably could obtain declarations from individuals who lived in Riverside County regarding their personal knowledge relevant to the sale. Yet, Carolyn failed to explain why she had not previously marshalled any admissible evidence to support her sham-auction allegations, which FAB 5 had been raising since at least January 9, 2025. Instead, she merely stated: "[t]he Lindholms do not have to prove anything. The undisputed facts speak for themselves. If the court wants to have a serious evidentiary hearing, the hearing should be scheduled on normal notice." According to Carolyn, the Lindholms' allegations regarding the auction were largely

15

irrelevant. She believed that Dye's statements alone proved the auction either was a sham or not commercially reasonable.

**G.    The good faith hearing and order.**

The court held a hearing on the good faith issue on February 26, 2025, at 10:10 a.m. Initially, the court acknowledged FAB 5's various requests for an evidentiary hearing. The court offered to permit the parties to present live testimony at 11:30 a.m. that day—including testimony to substantiate Carolyn's allegations regarding the sale. Carolyn demurred, stating that one hour was not adequate advance notice of the evidentiary hearing to enable her to present her evidence and witnesses.

The court pointed out that Carolyn had been raising the same allegations regarding a sham sale since she filed FAB 5's evidentiary hearing demand in early January. The court further noted that FAB 5 had never presented any evidence to demonstrate the existence of disputed issues of material fact necessitating an evidentiary hearing. The court explained that it was merely granting FAB 5's application for an order shortening time for an evidentiary hearing on the good faith issue. It then proposed to conduct the evidentiary hearing at 1:00 p.m. that afternoon, but Carolyn stated that she had another matter scheduled for that time, so the court returned to its original plan to hold the evidentiary hearing at 11:30 a.m.

The court recessed the matter until 11:30 a.m. At the time of the resumed hearing, the court offered to permit Carolyn to provide her own

hearsay testimony about what she was told and by whom relevant to the auction. Carolyn again demurred. She professed that she had no personal knowledge as to the issues she raised and did not even know the names of the individuals who did. She claimed that only her husband Robert had this information.

The court then sua sponte called Dye to testify to answer one or two questions about her efforts to market the horses in advance of the auction. The court observed that in the sale motion, Dye had stated her intent to list the auction on Craigslist and to promote the auction through Facebook posts by trainers. The court wanted Dye to explain why these steps were not mentioned in any of her post-sale filings regarding the sale. Dye indicated that she included these proposed actions in her motion to sell based on her pre-motion discussions with TCR's attorneys. At that time, she was asking for TCR's support and assistance in conducting the sale and the pre-sale marketing. Dye summed up her marketing and sale efforts as follows: "I have done the best I could, given the resources that I had, to spread the word about the availability of the horses. I've given you my best testimony on what happened at the sale. . . . I did the best I could with what I had to work with, so that's my explanation." Carolyn declined to cross-examine Dye.[11]

_____

[11] After Dye testified, the U.S. Trustee indicated that his concerns had been resolved regarding her request for good faith findings. But the U.S. Trustee continued to press his objection to the motion to seal. Ultimately, the court denied the request to keep the identities of the two third-party purchasers under seal.

The court then rendered its findings of fact on the good-faith issue. As a preliminary matter, it noted that the evidence submitted in Dye's February 25, 2025 declaration was uncontroverted. The court relied heavily on this evidence to render its findings, which mirrored the statements in Dye's declaration and the previously-filed reply. The court also found that Dye sufficiently advertised the auction. It pointed to the videos taken of each horse, the posting of the sale notice on the bankruptcy court's website, and the efforts of Dye, TCR, and its counsel to inform contacts in the horse world of the auction by word of mouth. The court further reasoned that the pre-auction inspections conducted and the attendance at the auction of roughly 15 people reflected the success of the parties' marketing efforts. The court further found that the sale price obtained for the five stallions at the auction reasonably approximated the market value of the horses. It added that the appraised value of the horses bolstered this finding. The court therefore concluded that all the purchasers qualified as good faith purchasers for value. In closing, the court observed there was no evidence of fraud, collusion, or anything else untoward involving Dye or any of the other parties involved in the marketing or sale of the horses.

On March 3, 2025, the court entered an order confirming that all the purchasers at the auction qualified as good faith purchasers within the meaning of § 363(m). The order also granted Dye's request for judicial notice but denied her request to place under seal the identity of the third-party purchasers who purchased two of the five stallions. The court

entered an amended order a few days later to provide greater detail explaining the circumstances surrounding the court's granting of Carolyn's request for an evidentiary hearing. FAB 5's appeals challenge both the sale authorization order and the good faith finding order.

## JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157. We have jurisdiction under 28 U.S.C. § 158 but must first consider whether this appeal is statutorily moot.[12]

The bankruptcy court determined that all the purchasers of the stallions qualified as good faith purchasers and that § 363(m) applied to the sale. Section 363(m) provides:

> The reversal or modification on appeal of an authorization under
> subsection (b) or (c) of this section of a sale or lease of property does
> not affect the validity of a sale or lease under such authorization to an
> entity that purchased or leased such property in good faith, whether

---

[12] These appeals also raise interesting questions as to who has standing to challenge the orders on appeal. FAB 5 has appealed both orders. As for the sale order, it is Robert who asserted a competing ownership claim to the horses—though he never opposed the sale motion or appealed the sale order. Yet, he was the person putatively injured by the sale order because the bankruptcy court found that the estate, rather than Robert, owned the horses. FAB 5 suffered no injury from the court's determination that the horses were its property. Thus, it appears that FAB 5 lacks standing to challenge the order authorizing the sale. *See Freedom From Religion Found., Inc. v. Chino Valley Unified Sch. Dist. Bd. of Educ.*, 896 F.3d 1132, 1142 (9th Cir. 2018) (explaining that parties who prevail in litigation generally lack standing to appeal). As for the order determining the purchasers' good faith, there is nothing in the record to suggest that FAB 5 had any cognizable financial stake in this determination that would give the chapter 7 debtor standing to appeal. *See Fondiller v. Robertson (In re Fondiller)*, 707 F.2d 441, 443 (9th Cir. 1983) (stating that "a hopelessly insolvent debtor does not have standing to appeal orders affecting the size of the estate.").

or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

"A good faith buyer is one who buys in good faith and for value." *Paulman v. Gateway Venture Partners III, L.P. (In re Filtercorp, Inc.)*, 163 F.3d 570, 577 (9th Cir. 1998) (cleaned up). "Although the Bankruptcy Code and rules do not define good faith, courts have indicated that a lack of good faith is shown by fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *Sw. Prods., Inc. v. Durkin (In re Sw. Prods., Inc.)*, 144 B.R. 100, 103 (9th Cir. BAP 1992) (cleaned up).

Good faith is a factual determination, which we review for clear error. *Thomas v. Namba (In re Thomas)*, 287 B.R. 782, 785 (9th Cir. BAP 2002). Factual findings are clearly erroneous only if they are "illogical, implausible, or without support in the record." *Retz v. Samson (In re Retz)*, 606 F.3d 1189, 1196 (9th Cir. 2010).

There was ample evidence in the record to support the court's good faith findings. The court found credible Dye's testimony both before and during the February 26, 2025 hearing. Dye sufficiently and persuasively explained her efforts to market and sell the horses and the limitations imposed on those efforts resulting from a penniless estate, the condition of the horses, and the continued accrual of boarding costs. The court found Dye's marketing and sale efforts sufficient, and FAB 5 has done nothing to explain how or why we should second-guess the bankruptcy court's

20

evaluation of Dye's efforts.

The court also found that there was no evidence of fraud, collusion, or grossly unfair advantage of anyone involved in the marketing and sale of the horses. The bankruptcy court specifically noted FAB 5's failure to present any evidence to support the allegations that the auction was a sham. We agree. Repeatedly arguing that the auction was a sham—or was "fake"—is not evidence.

Though FAB 5 disagrees with the bankruptcy court's good faith findings, it does not explain why these findings were clearly erroneous. Indeed, it only argues that it was denied due process as to the good faith determination. FAB 5 complains that it did not have an opportunity to gather and present evidence to support its belief that auction was a sham.

FAB 5 filed its first request for an evidentiary hearing on January 9, 2025. By that time, it was challenging the buyers' good faith and the sufficiency of Dye's marketing efforts. It alleged that Dye did not make a bona fide effort to legitimately market and sell the horses. Between the January 9, 2025 demand and the February 26, 2025 hearing on the good faith issue, there is nothing in the record to suggest that FAB 5 initiated any discovery as to the auction or did anything else to obtain relevant evidence regarding the auction. The failure during this six-week period to collect and present to the court evidence to support the sham-auction allegations fatally undermines FAB 5's complaint that it did not have enough time to present its opposition. *See In re Filtercorp, Inc.*, 163 F.3d at 577 (holding that

21

the appellant's complaint that he was not given adequate time to conduct discovery regarding the subject sale proceeding "is belied by his own failure to serve discovery requests and to seek a continuance" of the proceedings).

True, the court did not give much advance notice of the evidentiary hearing on good faith. But the court was not required to hold any evidentiary hearing in this instance. The court only is required to hold an evidentiary hearing when the parties' initial papers demonstrate the existence of a genuine and material disputed factual issue. *Compare Caviata Attached Homes, LLC v. U.S. Bank, N.A. (In re Caviata Attached Homes, LLC)*, 481 B.R. 34, 44-46 (9th Cir. BAP 2012) (evidentiary hearing not required), *with Cregar v. Barclay (In re Cregar)*, 2010 WL 6452905, at *5-6 (9th Cir. BAP Nov. 19, 2010) (evidentiary hearing required). Indeed, Central District of California LBR 9013-1(i) contemplates that most factual contentions arising from motions or oppositions "will be presented, heard, and determined upon declarations and other written evidence." Prior to granting FAB 5's evidentiary hearing motion, the court specifically noted that both the motion and opposition were accompanied by insufficient evidence. It required both parties to present supplemental evidence. Dye did. But FAB 5 specifically declined to do so. And when offered the opportunity to advise the court what specific evidence FAB 5 would present if provided more time, counsel for FAB 5 could not even provide that.

FAB 5 had six weeks to provide evidence in support of its challenge

22

of the buyers' good faith. That was sufficient time to obtain evidence in support of its argument. It failed to do so. To this day it has failed to provide any specific, admissible evidence to challenge the good faith of the buyers. As such, FAB 5's due process argument necessarily fails.[13]

In sum, FAB 5 never submitted, or even advised the bankruptcy court, of any evidence to challenge the buyers' good faith, and there is nothing in the record to suggest that the bankruptcy court's good faith findings were illogical, implausible, or unsupported by the record. Accordingly, § 363(m) applies. FAB 5 did not obtain a stay pending appeal, and § 363(m) bars this panel from modifying or setting aside the sale. As a result, FAB 5's appeals are moot. In the alternative, however, even if we were able to reach the merits, we find no error.[14]

---

[13] We acknowledge that under Rule 9014(e), the bankruptcy court was obliged to give FAB 5 reasonable advance notice that it was granting FAB 5's evidentiary hearing motion and that the February 26, 2024 hearing would be an evidentiary hearing. Regardless, we decline to address whether the bankruptcy court's offer at the hearing to postpone it for merely a few hours constituted a material procedural error. The only question raised on appeal is whether the court violated FAB 5's due process rights. As explained herein, because FAB 5 failed to produce any evidence to support the existence of a genuinely-disputed material factual issue, there was no entitlement to an evidentiary hearing. Therefore, the manner in which the bankruptcy court ultimately scheduled the evidentiary hearing could not have deprived FAB 5 of due process. *Cf. United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 272 (2010) (explaining difference between contravention of a procedural rule and the deprivation of due process—and concluding that the subject litigation only involved the former and not the latter).

[14] Dye filed a motion to dismiss these appeals based on myriad procedural deficiencies in FAB 5's appeal papers. While the motion is well taken, we deny it as unnecessary.

**ISSUES**

1. Did the bankruptcy court clearly err when it found that the bankruptcy estate owned the horses?

2. Did the bankruptcy court violate FAB 5's due process rights?[15]

**STANDARDS OF REVIEW**

We generally review the bankruptcy court's approval of a sale under § 363 for an abuse of discretion. *Clear Channel Outdoor, Inc. v. Knupfer (In re PW, LLC)*, 391 B.R. 25, 32 (9th Cir. BAP 2008). We also review for an abuse of discretion the bankruptcy court's application of judicial estoppel. *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 782 (9th Cir. 2001). The bankruptcy court abused its discretion if it incorrectly applied the law or its factual findings were clearly erroneous. *See TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820, 832 (9th Cir. 2011).

FAB 5's challenge to the court's ownership finding raises a question of fact that is subject to the clearly erroneous standard. *See Klein v. Sharp (In re Klein)*, 2025 WL 1724107, at *6 (9th Cir. BAP June 20, 2025). Factual findings are clearly erroneous only if they are "illogical, implausible, or without support in the record." *In re Retz*, 606 F.3d at 1196.

We review de novo FAB 5's due process argument. *DeLuca v. Seare (In re Seare)*, 515 B.R. 599, 615 (9th Cir. BAP 2014). "De novo review requires

---

[15] Most of FAB 5's due process argument pertains to the good faith proceedings. We already have addressed, above, this aspect of FAB 5's argument. All that remains to be addressed, below, is the issue of ownership of the horses and the portion of the due process argument concerning the sale authorization proceedings.

24

that we consider a matter anew, as if no decision had been made previously." *Francis v. Wallace (In re Francis)*, 505 B.R. 914, 917 (9th Cir. BAP 2014).

## DISCUSSION

Section 363(b)(1) provides that the trustee, after notice and a hearing, may sell estate assets outside the ordinary course of business. To obtain approval of a proposed sale under § 363(b)(1), the trustee must establish that the sale is in the best interest of the estate and that it will yield "optimal value . . . under the circumstances." *Delannoy v. Woodlawn Colonial, L.P. (In re Delannoy)*, 615 B.R. 572, 582 (9th Cir. BAP 2020) (citing *Simantob v. Claims Prosecutor, LLC (In re Lahijani)*, 325 B.R. 282, 288 (9th Cir. BAP 2005)). The trustee's position regarding the proposed sale ordinarily is afforded deference, particularly when it is based on her business judgment and when there is no creditor objection. *In re Lahijani*, 325 B.R. at 289.

Here, FAB 5 has challenged the bankruptcy court's approval of Dye's sale authorization motion on two grounds. According to FAB 5: (1) the bankruptcy court clearly erred when it found that the horses were property of the bankruptcy estate; and (2) the court violated FAB 5's due process rights.

## A. Ownership issue.

The trustee's authority under § 363(b)(1) to sell property extends only to property of the estate. *See Warnick v. Yassian (In re Rodeo Canon Dev. Corp.)*, 362 F.3d 603, 608 (9th Cir. 2004) (citing *Connolly v. Nuthatch Hill*

*Assocs. (In re Manning)*, 831 F.2d 205, 207 (10th Cir. 1987)), *opinion withdrawn and superseded*, 126 F. App'x 353 (9th Cir. Mar. 8, 2005), *as amended on denial of reh'g* (Apr. 1, 2005). FAB 5 claims that it did not own the horses at the time Carolyn filed the bankruptcy petition on its behalf, so the horses did not become estate property under § 541(a)(1).[16] More specifically, FAB 5 argues that the court clearly erred when it found that the bankruptcy estate owned the horses. FAB 5's ownership argument is twofold: (1) it contends that there was insufficient evidence to permit the court to reasonably conclude that the estate owned the horses; and (2) it claims that its evidence conclusively proved that Robert owned the horses. FAB 5 is mistaken on both counts. But before delving into these contentions, we will consider the bankruptcy court's application of judicial estoppel.

### 1. Judicial estoppel.

FAB 5's appellate brief completely ignores the bankruptcy court's judicial estoppel ruling. Before finding in the alternative that Dye's evidence was sufficient to support a finding that FAB 5's bankruptcy estate owned the horses, the bankruptcy court held that judicial estoppel barred FAB 5's belated claim that Robert owned the horses. FAB 5's failure to address the judicial estoppel ruling in its appeal brief amounts to a forfeiture of the issue. *See Milestone Fin., LLC v. Moon (In re Moon)*, 648 B.R.

---

[16] With certain exceptions not relevant here, § 541(a)(1) states that the bankruptcy estate consists of "all legal or equitable interests of the debtor in property as of the commencement of the case."

73, 91 (9th Cir. BAP 2023) (citing *Christian Legal Soc'y v. Wu*, 626 F.3d 483, 487–88 (9th Cir. 2010)), *aff'd*, 2024 WL 1635549 (9th Cir. Apr. 16, 2024).

Even if we were to reach the merits of the bankruptcy court's judicial estoppel ruling, we would affirm. Judicial estoppel—also known as estoppel of inconsistent positions—is a flexible equitable doctrine that federal courts have discretion to apply to prevent a litigant from deriving an unfair advantage by taking clearly inconsistent positions in the same legal action or different legal actions. *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 782–83 (9th Cir. 2001); *Mellem v. Mellem (In re Mellem)*, 625 B.R. 172, 184 (9th Cir. BAP 2021), *aff'd*, No. 21-60020, 2021 WL 5542226 (9th Cir. Nov. 26, 2021).

In addition to the clear inconsistency of positions and the presence of an unfair advantage to the proponent, the Ninth Circuit typically requires that the same court (or a prior court) must have "accepted" or "relied" on the prior position before barring the proponent from asserting its new position. *Hamilton*, 270 F.3d at 782–83. This acceptance or reliance need not be permanent in the sense of a final judgment or ruling that remains in effect. *See id.* As long as the proponent obtained from the court or otherwise derived some benefit or advantage by advocating the prior position, the ephemeral nature of the acceptance—or of the benefit derived—does not render judicial estoppel inapplicable. *Id.*

Here, FAB 5 represented in its bankruptcy petition and in the turnover motion filed shortly thereafter that it owned the horses. As a

27

result of this representation, the automatic stay under § 362(a) enjoined the Lienholders from conducting a state court lien sale of the horses. FAB 5's assertion of ownership thus enabled FAB 5 to halt the Lienholders' efforts to sell the horses and any other collection efforts.

In FAB 5's later opposition to Dye's motion to sell the horses, both Carolyn and Robert executed new declarations claiming that they were "mistaken" when they formerly represented that the horses were owned by FAB 5 at the time of the bankruptcy filing. According to these declarations, FAB 5 never owned the horses. The above-referenced facts amply establish both clearly-inconsistent positions and court reliance or acceptance. Thus, those elements for judicial estoppel have been satisfied.

FAB 5 claims that it simply made a factual mistake when, for several years, it told a variety of courts and third parties that it owned the horses. This argument suggests that FAB 5 did not change its position to obtain an unfair advantage but rather made an innocent mistake. The bankruptcy court found otherwise. Its comments and rulings indicate that it did not believe FAB 5's change in position regarding ownership was the result of a simple mistake. To the contrary, the court found Carolyn's and Robert's testimony on this point not credible. The record supports this conclusion. The convenient timing of the Lindholms' purported discovery of the "mistake," the failure to produce the registration for the horses or any other documentation to support FAB 5's new ownership claim, and the Lindholms' repeated failure to describe the specifics of their purported

28

mistake and how they came to learn of it years after the fact, all undermine the credibility of the Lindholms' simple-mistake claim.

More importantly, what litigants and their counsel put in their bankruptcy petitions and papers matters and often results in serious consequences for multiple interested parties. The Bankruptcy Code, Rules, and courts thus impose on debtors an affirmative duty to accurately and completely disclose their financial affairs. *See id.* at 785; *see also Cusano v. Klein,* 264 F.3d 936, 946 (9th Cir. 2001) ("The debtor has a duty to prepare schedules carefully, completely, and accurately." (cleaned up)). The efforts of both of the Lindholms in this regard were woefully deficient. They now claim to have filed a bankruptcy on behalf of FAB 5 without verifying that this entity was anything other than an empty shell.[17] Only when it became convenient for them to discover that FAB 5 did not own the horses did the Lindholms suddenly and instantaneously "learn" that FAB 5 allegedly never held title to the horses—or any other assets. Even then, the

---

[17] Carolyn's status as a licensed attorney, an officer of the court, and as counsel for a litigant in bankruptcy court all mandated a higher standard of conduct from her. For instance, Rule 9011(b)(3) imposed on her a duty to make a reasonable **advance** effort to ensure that her "allegations and factual contentions have evidentiary support." However, the record indicates that she failed to make any such effort when she filed the petition and the turnover motion stating that FAB 5 owned the horses. Later, she filed a demand for an evidentiary hearing alleging that the sale of the horses was a sham, but when the bankruptcy court gave her the opportunity to present, or even describe, the evidence supporting her sham-sale allegations, she stated that she had none within her possession or control to present. Indeed, she was unable to provide even hearsay testimony to support her sham-sale allegations, which were supposedly based, in part, on her husband's knowledge.

Lindholms exploited FAB 5's bankruptcy to assert **Robert's** claim of ownership of the horses without Robert ever asserting his ownership claim on his own behalf.

Under these circumstances, the bankruptcy court correctly determined that judicial estoppel applies. On this record, the principals of FAB 5 would have realized a manifestly unfair advantage if they were permitted to change FAB 5's longstanding position regarding ownership of the horses.

### 2. Ownership finding.

Even in the absence of its judicial estoppel ruling, there is ample evidence in the record to support the bankruptcy court's finding that FAB 5 owned the horses at the time of its bankruptcy filing. The Lindholms admitted on multiple occasions that FAB 5 owned the horses. They made these admissions before, during, and immediately after Carolyn filed the bankruptcy petition on FAB 5's behalf. Before she filed the petition, Carolyn signed the contracts attached to TCR's proof of claim, in which she stated that FAB 5 owned the horses. Similarly, the Lindholms stated in several state court pleadings and papers that FAB 5 owned the horses. Indeed, FAB 5's ownership of the horses was an important component of their pre-bankruptcy litigation. Moreover, FAB 5 filed its bankruptcy specifically to stay the Lienholders' efforts to collect from FAB 5, not Robert. The bankruptcy petition itself referred to FAB 5's ownership of perishable assets in the possession of TCR, which the bankruptcy court

30

reasonably inferred to be a reference to the horses.

Finally, immediately after commencing the bankruptcy, Carolyn filed on behalf of FAB 5 a motion seeking to require TCR to turn over possession of the horses. In the motion itself, Carolyn referred to the horses as being owned by FAB 5. Likewise, the moving papers included a declaration from Robert, signed on behalf of "the debtor" under penalty of perjury, which stated that the debtor owned the horses.

Importantly, no one has challenged the authenticity or construction of any of these admissions. In fact, the Lindholms have acknowledged them. In their bankruptcy court papers, they represented that all their prior statements regarding ownership—including those they made to courts in the course of litigation—were simply mistaken. Only after conversion of the case to chapter 7 and the filing of Dye's motion to sell the horses did the Lindholms suddenly discover and disclose their alleged mistake as to ownership of the horses. Despite their multiple prior statements to the contrary, they supposedly "recently learned" that FAB 5's accountant failed to transfer title from Robert to FAB 5, so Robert owned the horses. The resulting declarations stating their belief as to Robert's ownership were self-serving, conclusory, and incredibly convenient.

Missing from these declarations were any specifics regarding precisely when they learned of the ownership issue, from whom, and under what circumstances. Also missing was any documentation corroborating the Lindholms statements regarding who held title to the

31

horses. The Lindholms claim that by the time of the October 9, 2024 sale authorization hearing, they possessed such title documentation. Inexplicably, however, they failed to present this documentation to the court. Indeed, the record indicates that they never produced this alleged documentation to Dye, the U.S. Trustee's office, or the Lienholders.

Under these circumstances, the bankruptcy court did not find the Lindholms' new ownership claims credible. The court's decision to credit the Lindholms' earlier undisputed actions and admissions that FAB 5 owned the horses over their later unsupported statements about ownership was not illogical, implausible, or unsupported by the record. In short, the bankruptcy court's ownership finding was not clearly erroneous.

## B.    Due process.

Fab 5's due process argument centers on the constitutional right to procedural due process, which requires both reasonable advance notice of the relief sought by the opposing parties and reasonable opportunity to respond and present its position. *Solimano Framing Grp. LLC v. Pier Constr. & Dev., LLC (In re Solimano Framing Grp. LLC)*, 664 B.R. 803, 813 (9th Cir. BAP 2024) (citing *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950)). As the Supreme Court explained roughly fifty years ago, due process is a flexible requirement depending on the particular circumstances of the case. *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976). FAB 5 claims that the bankruptcy court violated its due process rights during the sale authorization proceedings. More specifically, it claims that Robert brought

with him to the October 9 sale hearing recently-obtained documentation proving his ownership of the horses at the time of FAB 5's bankruptcy filing. FAB 5 further maintains that the court erred because it did not "ask" him to present his documentary evidence or otherwise give him an opportunity to present the documentation at the hearing.[18] Though represented by counsel, FAB 5 fundamentally misunderstands how written evidence ordinarily is presented to the court in contested matters in the bankruptcy court. Typically, such written evidence accompanies the parties' papers **in advance** of the hearing. *See, e.g.*, Cent. Dist. Cal. LBR 9013-1(c)(3) and (f)(2).[19]

FAB 5 never explained either in the bankruptcy court or on appeal the timing or circumstances surrounding Robert's procurement of the alleged ownership documentation. Again, FAB 5 has never shared this alleged documentation with any other interested party. If it had the

---

[18] It remains unclear how **FAB 5's** due process rights could have been violated by **Robert** allegedly being denied a reasonable opportunity to present his evidence allegedly proving that FAB 5 did not own the horses—when he never opposed the sale motion.

[19] In relevant part, FAB 5's opposition to the sale motion was subject to Central District of California LBR 9013-1(f)(2), which states: "A Response must be a complete written statement of all reasons in opposition thereto or in support, **declarations and copies of all evidence on which the responding party intends to rely**, and any responding memorandum of points and authorities." (Emphasis added.) A number of other bankruptcy courts within the Ninth Circuit also have local bankruptcy rules contemplating the submission of evidence with the parties' papers in support of or in opposition to the relief sought in a contested matter. *See, e.g.*, Dist. Alaska LBR 9013-1(a)(2) and (3), (b)(2) and (3); Dist. Hawaii LBR 9013-2(c); Dist. Nev. LBR 9014(c), (d); W. Dist. Wash. LBR 9013-1(d)(1)(A); E. Dist. Cal. LBR 9014-1(d)(3)(D) and (f)(1)(B).

documentation in time to include it in its opposition to the sale motion, then it should have been attached to that opposition. If FAB 5 did not have it in time, it was incumbent on it to make an appropriate request either for additional time to present the documentation or to submit supplemental evidence. Barring that, counsel for FAB 5 could have filed a motion for rehearing under Civil Rule 59, made applicable in bankruptcy cases by Rule 9023.

Simply put, FAB 5 had notice of the motion and the opportunity to respond. Its decision to sit on its hands and failure to present the alleged ownership documentation to the court is not a due process violation.

## CONCLUSION

For the reasons set forth above, these consolidated appeals are DISMISSED based on mootness. Alternatively, we AFFIRM.